(117 P.3d 896)
No. 93,013

MATTHEW PATRICK SALL, By and Through His Natural Parents, Guardians, and Conservators, KAY SALL and DAVID SALL, and KAY SALL and DAVID SALL, Individually, *Appellants*, v. T's, INC., d/b/a SMILEY'S GOLF COMPLEX, *Appellee*.

Opinion filed August 19, 2005.

*Bryson R. Cloon,* of Cloon Law Firm, of Leawood, for appellants.

*Steve R. Fabert,* of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellee.

Before ELLIOTT, P.J., MARQUARDT and MCANANY, JJ.

MARQUARDT, J.: Kay and David Sall (the Salls), acting as Matthew Patrick Sall's guardians and conservators, appeal the trial court's grant of summary judgment to T's, Inc., d/b/a Smiley's Golf Complex (SGC). We affirm.

On June 14, 2001, Patrick and his friend, Christopher Gannon, decided to go golfing. They had discussed the weather that had been stormy earlier in the day. By 4 p.m., the weather was clear. Gannon checked the Weather Channel on television and saw that the storm appeared to be heading out of the area.

On June 14, 2001, Thad Borgstadt, the manager at SGC, opened the course as usual in the morning and testified that the weather was "nice." However, Borgstadt closed the course at approximately 1:15 p.m., after he saw dark clouds in the sky and heard an alert on the television. Borgstadt sounded the horn which alerted golfers that they needed to immediately return to the clubhouse. Borgstadt left SGC at 3 p.m.

Jeff Tull replaced Borgstadt and at 3:50 p.m. Jeff checked the radar on the computer. He noted that the thunderstorm had moved out of the area of SGC. Jeff reopened SGC to the public at 4 p.m. Jeff testified that conditions at SGC were sunny as late as 4:50 p.m.

Gannon estimated that he and Patrick paid their greens fees at approximately 4:45 p.m. and arrived at the first tee box shortly before 5 p.m. Gannon described the weather as "fairly clear." Patrick and Gannon played the first hole and as they were walking to the second tee, they noticed a very light rain. Gannon did not

consider the rain to be anything that would cause SGC management to close the course, so they continued to play with the understanding that they would reevaluate their decision if the weather conditions changed.

Patrick's drive on the second hole went wide and it took him a few minutes to locate his ball. As they started putting on the second green, Gannon saw a lightning bolt in the western sky. Gannon thought the lightning was far off but testified that they would quit after they putted out on the second hole.

At approximately 4:50 p.m., Jeff checked the weather radar on the computer. While the computer image was loading, a golf course employee told Jeff that he heard storms would be moving back into the area. When the radar image had loaded, Jeff could see storms to the southwest of SGC.

Jeff walked outside, saw lightning, and blew the horn for two 5-second periods, rotating so that the sound would spread across the SGC complex. At the time that Jeff blew the horn, there were approximately five golfers on the course.

Gannon was holding the flag for the second hole when he heard the horn. After the horn sounded, Gannon saw a second lightning bolt in approximately the same location as where he had seen the first lightning bolt. Patrick putted out, and then Patrick and Gannon started toward the clubhouse.

Gannon testified that as they were walking, he saw a big flash of light followed by a loud boom. Gannon blacked out, fell to the ground, and lay unconscious. When Gannon came to, he could see Patrick face down on the ground. After attempts to rouse Patrick were unsuccessful, Gannon went to the SGC clubhouse for emergency assistance.

Between 5:16 and 5:17 p.m., Gannon arrived at the clubhouse and reported Patrick's injury. Jeff immediately called 911. Several golfers began giving Patrick CPR. Emergency personnel arrived and transported Patrick to the hospital. Patrick was severely injured and now requires total care.

In January 2003, the Salls filed a petition claiming that SGC owed "Patrick the duty to warn him of any dangerous condition it knew about, or should have known about, had Smiley's exercised

reasonable care." The Salls claimed that SGC was negligent by failing to: properly monitor the weather; sound a timely warning; utilize lightning detection equipment; have appropriate medical equipment; and render timely and appropriate medical care.

SGC filed a motion for summary judgment claiming that it breached no duty to Patrick. In addition, SGC claimed that any duty it owed to Patrick was satisfied with the timely warning to leave the golf course. In response to SGC's motion for summary judgment, the Salls raised a new issue—that SGC assumed a duty to warn and protect Patrick against dangerous weather because Patrick relied on a weather warning system. To support this claim, they attached Mrs. Sall's deposition where she testified that Patrick told her: "Mom, don't worry; they wouldn't be open if it wasn't safe."

The trial court heard arguments on SGC's motion and concluded that storms are capricious and foreseeing a lightning strike is a matter of speculation. Based on this lack of foreseeability, the trial court concluded that businesses do not have a duty to protect or warn patrons about lightning. The trial court also ruled that the facts of the case were "insufficient to invoke the benefits" of Restatement (Second) of Torts § 323 (1964). SGC's motion for summary judgment was granted. The Salls timely appeal.

Essentially, the Salls' case is based on premises liability law in that golf courses have a duty to warn their patrons about dangerous weather conditions and to protect those patrons from lightning injury.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to successfully oppose summary judgment, there must exist a material disputed fact. On appeal, we apply the same rules.

Where we find that reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002).

## Premises Liability Law and Foreseeability

The Salls claim that Kansas courts recognize the doctrine of premises liability which is not limited to physical defects. They conclude that a force of nature can be a "dangerous condition" that would impose liability.

Kansas has abolished the distinction between licensees and invitees. See *Jones v. Hansen*, 254 Kan. 499, 509, 867 P.2d 303 (1994). The duty of care owed to licensees and invitees is one of reasonable care under the circumstances. The factors to consider in determining whether the land occupier exercises reasonable care under all circumstances are: the foreseeability of harm; the magnitude of the risk of injury in maintaining such a condition of the premises; the individual and social benefit of maintaining such a condition; and the burden upon the land occupier or community, in terms of inconvenience or cost, in providing adequate protection. *Jones*, 254 Kan. at 509-10. As a general rule, an owner of a business is not required to insure the safety of his or her patrons or customers. *Gardin v. Emporia Hotels, Inc.*, 31 Kan. App. 2d 168, 175, 61 P.3d 732, *rev. denied* 275 Kan. 963 (2003). As aptly stated by the trial court, "[t]his case turns on whether or not Smiley's had a duty." The Kansas Supreme Court has held that the question of duty is a question of law for the court. *Siebert v. Vic Reginier Builders, Inc.*, 253 Kan. 540, 856 P.2d 1332 (1993).

The Salls contend that Patrick would have been able to protect himself had he been given sufficient warning of the imminent storm. The interesting part of this contention is that Patrick and Gannon saw a lightning strike and ignored it. The second lightning strike occurred as the horn was blown when Patrick and Gannon were on the second green. Instead of immediately returning to the clubhouse, Patrick and Gannon continued to finish the hole. Patrick and Gannon made a conscious decision to finish the hole they were playing, rather than heeding the warning immediately. No

one thought there was imminent danger. Mills thought there was no danger and that SGC had blown the horn prematurely; however, he decided to return to the clubhouse.

Kansas courts have not defined foreseeability of lightning strikes within the context of premises liability. However, a Texas court considered whether a lightning strike could be foreseeable. In *Macedonia Baptist Church v. Gibson*, 833 S.W.2d 557 (Tex. App. 1992), a woman was struck by lightning as she exited her church. Prior to the incident, the church had installed a lightning rod. Gibson was injured by lightning which hit the rod and traveled down the grounding cables.

The Texas court ruled that for a result to be legally foreseeable, "all that is required is that the injury be of such a general character as might be reasonably anticipated and that the injured party should be so situated with relation to the wrongful act that the injury to him [or her] or to one similarly situated might reasonably have been foreseen." 833 S.W.2d at 559. The church had been told that lightning would travel down the ground cables and spread into the ground. In this case, the church enhanced the risk of injury by placing the ground cables directly next to the walkway. A person using the walkway could be hit by a side flash; therefore, the court ruled that the injury was foreseeable. 833 S.W.2d at 559-60.

Here, it is undisputed that the storm system which produced the lightning bolt that hit Patrick was moving at approximately 60 nautical miles per hour, that lightning bolts can precede a storm by as much as 10 miles, and that the National Weather Service (NWS) issued an alert at 4:25 p.m., which included Johnson County. The alert noted that more rain and thunderstorms were on the way and predicted the leading edge of the rain would arrive in south Johnson County by 5 p.m. It is undisputed that no one at SGC read this NWS alert. Finally, it is generally accepted that the lightning bolt struck Patrick at approximately 5:07 p.m.

Leslie Lemon testified in a deposition as one of the Salls' expert witnesses. He noted that on June 14, 2001, there was a severe thunderstorm watch earlier in the day. Lemon testified that by approximately 4:30 p.m., the radar data for June 14, 2001, indicated that thunderstorms would arrive over the golf complex. However,

he acknowledged that there was no lightning between 2:24 p.m. and 5:06 p.m. on the day in question.

Dr. Edmund Krider, SGC's expert witness, testified in a deposition that thunderstorms are complicated, three-dimensional structures. Dr. Krider believes that there is an "extremely low" possibility of lightning striking outside of a 6-mile radius, and he believes that SGC personnel did a good job of sounding the horn because the lightning was outside that 6-mile range. Dr. Krider disputed Lemon's analysis regarding the time at which the storm would have been visible on radar, noting that storms change, build, and decay over time. He opined that a lightning detection system would not have saved Patrick from the lightning strike because he believed Patrick was struck by a lightning bolt from outside a 6-mile radius.

Dennis Tull, the owner of SGC, left the golf course at approximately 4 p.m. on June 14, 2001, and recalled that the weather was visibly clear between 4 and 5 p.m. Toby Mills was on the seventh hole when he heard the horn from the SGC clubhouse. He said that at the time, he did not want to go into the clubhouse, because the "sky was totally clear" and "completely sunny," and it was "going to be a long time before [the storm] is here." Mills said there was nothing "in the air to make me think that I want to stop playing golf." Jeff confirmed that the dark clouds did not move in until after 5 p.m.

It is necessary to differentiate between the foreseeability of a thunderstorm versus the foreseeability that there would be a lightning strike directly over SGC. The Salls seem to suggest that the former is the benchmark which must be used. We disagree. The expert testimony was divided on foreseeability of the thunderstorm. The testimony from people who experienced the conditions on June 14, 2001, was remarkably consistent. The thunderstorm which produced the lightning that hit Patrick moved in quickly. We do not believe that persons without advanced meteorological training could have known that a lightning-producing thunderstorm would arrive moments after the sky was "totally clear."

The Salls argue that SGC should have foreseen a lightning related injury and that this is proven by the fact that SGC's manage-

ment acknowledged that lightning is dangerous to golfers. However, general knowledge that lightning is dangerous is quite different from being able to predict when and where lightning will strike.

The Superior Court of New Jersey ruled in *Maussner v. Atlantic City Country Club, Inc.*, 299 N.J. Super. 535, 552, 691 A.2d 826 (1997), that "[a] particular lightning strike is clearly unpredictable. There is no way that present technology can predict whether a bolt of lightning will strike a tree, a bush, a rock, or any of four golfers standing near them." 299 N.J. Super. at 552. In this case, with these particular storm conditions, we believe it would have been nearly impossible for SGC personnel to know that a bolt of lightning would hit on the second fairway.

If we view the testimony in the light most favorable to the Salls, SGC personnel should have known by 3:50 p.m. that a thunderstorm was heading for the complex and lightning would strike on the course. However, even Lemon could not testify that there would be lightning in the storm, or a bolt of lightning would strike the ground in direct proximity to Patrick. There were many unknown variables, which lead us to agree with the trial court that the lightning strike at SGC was not foreseeable.

### Duty to Utilize Lightning Detection Equipment

The Salls claim that SGC failed to comply with all relevant standards of care that are recognized customary conduct of the industry. The Salls argue that there is evidence the use of lightning detection systems has become part of the golf course industry's standard of care.

The Court of Civil Appeals of Oklahoma noted in *Grace v. City of Oklahoma City*, 953 P.2d 69, 71 (Okla. App. 1997), that lightning "is a universally known danger created by the elements." For that reason, the Oklahoma court was unwilling to require a golf course to "alter its premises to protect against lightning." The Tennessee Supreme Court considered golf course liability in *Hames v. State*, 808 S.W.2d 41, 45 (Tenn. 1991), and found that with lightning, "the risk to be guarded against is too remote to impose legal lia-

bility." In rendering its decision, the court specifically found that "there is no industry standard to implement warning devices."

The Salls cite *Maussner*, in which the Superior Court of New Jersey ruled that when a golf course has taken steps to protect golfers from lightning strikes, it owes those golfers "a duty of reasonable care to implement its safety precautions properly." 299 N.J. Super. at 553. Significantly, the court did not impose an absolute duty on golf course operators to protect their patrons from lightning.

Other than lightning rods attached to the light poles on the driving range, a television, a weather radio, computer radar, and the use of the horn, Dennis Tull had not considered the use of any other weather warning systems. The SGC scorecard contains a warning to golfers that they assume all risks when playing. In addition, Mills testified that on the day of the incident, he noticed a sign which informed golfers that when conditions for lightning or bad weather exist, they were to immediately cease playing and return to the clubhouse. The sign also said that golfers "must play at their own risk." Mills described the sign as being "very apparent and obvious."

Dr. Krider, SGC's expert witness, testified that detection systems respond to lightning at an "enormously wide range of distances," resulting in an "unacceptable number" of false alarms. Michael Flynn, a professor at Nova Southeastern University's law school, testified that SGC's failure to have a lightning detection system on the premises was not in accord with the standard operating procedures for golf courses. However, he acknowledged that no governmental entity or the United States Golf Association (USGA) has required lightning detection systems for golf courses. Professor Flynn also acknowledged that there have not been any independent reliable studies performed on lightning detection systems.

Edward Wankel, who formerly worked as the Deputy Commissioner of Parks, Recreation, and Historical Preservation in New York, agreed that a lightning detection system was "probably not necessary." In his opinion, it was more important to have a variety of safety procedures, including human input.

It is apparent from the evidence that there is no golf course industry-wide standard of care which requires the use of a lightning detection system. Also, there is no agreement among weather professionals regarding the use of lightning detection systems. No jurisdiction in this country has found that failure to use lightning monitors is a breach of an industry standard of care. Even the *Maussner* decision failed to make such a finding. See 299 N.J. Super. at 553-54.

Although there is some dispute as to the placement of the warning signs, a golfer who was on the course at the time of Patrick's injury testified that SGC warned golfers. The "play at their own risk" language is similar to that used in *Maussner*, and it would theoretically, under that decision, absolve SGC from liability for golfer injuries due to inclement weather. See 299 N.J. Super. at 554. In addition to the sign, SGC had safety measures in place, including an internet connection to weather radar and a weather radio.

Courts in other jurisdictions, as well as expert witnesses in this case, have articulated the reasons that lightning detection monitors are not a guarantee for golfing safety. We are not prepared to impose a new standard of care for golf course operators when the evidence for their use is less than compelling. Therefore, regardless of what other golf courses in the area were doing, we do not find that SGC breached any standard of care simply by failing to use a lightning detection system.

### SGC's Duty to Warn of Dangerous Conditions

The Salls contend that under Kansas law, SGC was required to warn Patrick of the risk of lightning-related injury. The Salls claim that a timely warning would have allowed Patrick to reach the clubhouse before the lightning struck on the golf course.

In order to find that SGC breached its duty to timely warn, we would first have to determine the duty that was owed.

Mills testified in two different depositions that there was a 5-to-10-minute lapse between the time that SGC blew the horn and when the lightning bolt appeared. Professor Flynn testified that the horn was not timely, based on his belief that on large golf

courses, it takes approximately 35 minutes for a golfer to reach safety. Flynn did not know how long it would have taken a golfer at SGC to reach the clubhouse from the second green. SGC is a par 3 executive golf course that covers approximately 40 acres. SGC asserts that the distance from where Patrick was to the clubhouse was approximately 1 quarter of a mile.

SGC employees were alerted to the potential for bad weather during a news teaser. However, due to delays with computerized radar images, it was likely that the thunderstorm cell which produced the lightning bolt that injured Patrick was not visible on radar until after 5 p.m., after the horn had already sounded.

Bruce Thomas, a Kansas City meteorologist, testified on Patrick's behalf. His opinion was that SGC should have closed the golf course when employees saw approaching storms. He based his opinion on "Patrick Sall's injuries." He testified that because Patrick was injured, SGC must have done something wrong. Aside from the fact that a golfer was injured, Thomas could not identify any other aspects in which SGC was deficient.

It is undisputed that Gannon and Patrick continued to golf, even after Gannon spotted lightning off in the distance. There is compelling evidence that Patrick did not immediately head to the clubhouse after hearing the horn, but lingered on the golf course for as long as 10 minutes. Patrick was a young man, described as being in "pretty good physical shape." He should have been able to travel the quarter-mile from the second green to the clubhouse in well under 10 minutes.

We do not believe that SGC had a duty to foresee lightning under these circumstances. Nevertheless, if such a duty did exist, we do not believe it was breached. By all accounts, SGC provided its customers with approximately 10 minutes' notice that lightning had been seen in the area. Gannon and Patrick saw the lightning themselves and chose to remain on the golf course. There is no evidence that SGC's horn was not sounded early enough to allow all golfers to reach the safety of the clubhouse. Such action does not make SGC negligent.

We have thoroughly reviewed the Salls' arguments, and we agree with the trial court that there is no evidence the lightning bolt was

in any way foreseeable, or that SGC breached any applicable standard of care. Patrick's injury was tragic, but we do not believe SGC is responsible for his condition. The trial court correctly ruled on the Salls' common-law negligence complaints.

## Restatement (Second) of Torts

On appeal, the Salls renew their argument that SGC assumed a duty to protect its patrons by providing a weather monitoring and warning system upon which golfers could rely. They believe the trial court actually found that they presented sufficient evidence to support a claim under the Restatement (Second) of Torts § 323, but ruled against them so the entire case could proceed on appeal.

The Salls' claim here is not accurate. The trial court expressly found that the "facts in this case are insufficient" to invoke the benefits of § 323. Nothing in that language even suggests that the trial court actually believed the Salls presented sufficient evidence to support a claim. In fact, the opposite is true. In the alternative, the Salls argue that the trial court erred in its decision, because the facts of this case "are clearly sufficient" to support an assumption of duty theory.

The Restatement (Second) of Torts § 323 reads:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking."

We do not believe that any court in the country has relied on § 323 to impose liability for a golf course lightning injury claim.

At the outset, we note that § 323 is, at its heart, focused on theories of negligence. We have already determined that SGC did not act negligently. Consequently, an individual must fail to exercise reasonable care before the Restatement may be applied to the particular facts of a case. In this aspect, we agree with the trial court that there are insufficient facts here to invoke the protections of § 323, as SGC did not fail to exercise reasonable care.

The Salls cite the *Maussner* case, claiming that a golf course assumes a duty to exercise reasonable care in warning of dangerous weather. We do not agree with the Salls that the facts in this case are analogous to those in *Maussner.* We have already noted that SGC had signs with the "play at your own risk" language on them. In *Maussner,* the club did not use reasonable care to implement its safety precautions and that is why the court found the club liable. SGC used reasonable care under the circumstances in sounding the horn. For that reason, we reject the Salls' attempt to favorably compare their case to *Maussner.* We agree with the trial court that the Restatement (Second) of Torts § 323 does not apply to the facts of this case.

The dissent claims that the majority focused on facts favorable to the moving party; however, the issues raised in this case do not revolve around facts; they are legal issues. Notwithstanding the legal issues, the facts are that Patrick and Gannon noticed two bolts of lightning and heard the horn, and they still continued to play.

The question in this case is whether SGC had a legal duty to Patrick, and if that duty was breached. Lightning, as the trial court noted, ". . . is random. . . . Storms are random. . . . They turn, they stop, they back up. I don't believe there's anyone that can predict the location of a future lightning strike. . . . Foreseeabiltiy is speculation." The location of a lightning strike is not foreseeable; therefore, there can be no duty to prevent injuries as a result of such a strike. Without a duty, there is no breach.

Affirmed.

MCANANY, J., dissenting: This case comes to us following the district court's entry of summary judgment in favor of SGC. In arriving at this judgment the district court was required to view the evidence in the light most favorable to the Salls and resolve all reasonable inferences in their favor. Viewed from this perspective the evidence discloses the following:

SGC has had a system in place to warn golfers of dangerous weather conditions since 1989. The warning system consists of monitoring the weather and sounding a warning horn when dangerous weather is approaching. Because the approach of a danger-

ous storm cannot always be detected by unaided human observations, SGC uses a television tuned to the Weather Channel to provide live doppler images of approaching storms, a weather radio, and a computer link to the internet. It is SGC's policy to make a visual check for weather in the area every 10 to 15 minutes. SGC personnel also periodically check the weather on the internet and keep the television and weather radio turned on at all times during business hours to monitor weather activity. Jeff Tull, the manager on duty on the afternoon in question, testified by deposition that on days when there were storms in the area it was his practice to check on the weather more frequently.

On the day in question the course had been closed for a time due to dangerous storms and lightning in the area. The course was reopened at approximately 4 p.m. Patrick Sall left his home sometime around 4 p.m. to play golf with Chris Gannon. When Patrick's mother questioned him about the weather, he responded, "Mom, don't worry; they wouldn't be open if it wasn't safe."

Tull, SGC's manager, did not check for weather information from approximately 3:50 p.m. until approximately 5 p.m. At 4:25 p.m. a weather advisory was issued on weather radio warning that fast-moving thunderstorms were approaching the area. SGC failed to take note of this warning, however, since the weather radio was apparently set on the "alert mode," which only sounds a warning in the event of a tornado or large hail. Had the radio been properly set, it is likely that SGC would have heard the 4:25 p.m. weather advisory.

Patrick and Chris paid their greens fee and teed off at the first hole between 4:45 p.m. and 4:50 p.m. Chris saw two lightning strikes off to the west before the warning sounded. Leslie Lemon, a meteorologist specializing in radar, calculated that Tull sounded the storm warning horn at 5:04 p.m. Patrick was struck by lightning at 5:06 p.m. It took Chris 5 to 10 minutes to get back to the clubhouse after Patrick was struck.

I am troubled by the fact that the majority opinion does not always focus on the facts most favorable to the nonmoving party and refers to conflicts in the testimony of opposing experts. The district court's and our perspective at this stage of the proceedings

is always from the vantage most favoring the nonmoving party. Further, the conflicts in testimony that raise issues of material fact demonstrate the need for a jury trial to resolve them.

I am more troubled, however, by the majority opinion's conclusion that a lightning strike at SGC was not foreseeable. First, the majority opinion would require not merely foreseeability of harm on SGC's premises, but foreseeability that the lightning would strike on a particular fairway. This is not a fair reading of *Maussner v. Atlantic City Country Club, Inc.*, 299 N.J. Super. 535, 552, 691 A.2d 826 (1997), cited in the majority opinion, where this concept is discussed. Second, it ignores the fact that even SGC foresaw that the approaching storm presented a danger to its patrons. That, after all, is why Tull sounded the warning. The issue is not whether the storm's danger was foreseeable, but when was it foreseeable and when should the warning have been sounded. SGC undertook to sound a warning. Having undertaken this task, the real question is whether SGC did so in a timely fashion or in an untimely, negligent fashion.

Restatement (Second) of Torts § 323 (1964) provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if
  (a) his failure to exercise such care increases the risk of such harm, or
  (b) the harm is suffered because of the other's reliance upon the undertaking."

This section of the Restatement correctly states Kansas law. See *Cunningham v. Braum's Ice Cream & Dairy Stores*, 276 Kan. 883, 891, 80 P.3d 35 (2003). I am not a proponent of an expansion of the common law at the margins by imposing an absolute duty upon golf course operators to protect their patrons from lightning strikes. However, there is a clear, logical place in the interstices of the common law for applying the Restatement to the facts before us. That was done in *Maussner* when the court announced: "We find that when a golf course has taken steps to protect golfers from lightning strikes, it owes the golfers a duty of reasonable care to implement its safety precautions properly." 299 N.J. Super. at 553.

Similarly, although the court in *Seelbinder v. County of Volusia*, 821 So. 2d 1095, 1097 (Fla. 2002), found no liability based on a lack of causation (the storm that produced the lightning was not the storm the defendant undertook to warn against), the court recognized: "If any duty to warn exists, it arises from the County's having undertaken to provide warnings of lightning to beachgoers. Having undertaken this responsibility, the County was obliged to exercise reasonable care in so doing."

I have no view on the ultimate outcome of this case. Obviously, there are issues of comparative fault. I am convinced, however, that the many conflicts in the testimony of the lay and expert witnesses should be resolved by a jury, not summarily by the district court.

Finally, the majority opinion concludes that the Restatement rule does not apply because SGC is not negligent. I confess I am not wise enough to arrive at this conclusion regarding negligence without the opportunity to weigh the credibility of the witnesses on the various conflicting factual contentions and expert opinions. I defer to the jury on those issues, and so should the district court. Further, if one must show negligence before the Restatement rule applies, the Restatement rule becomes utterly meaningless since to establish negligence there must be the breach of a duty. To the contrary, the Restatement rule is simply a vehicle for recognizing a duty which, but for the conduct of the defendant, the law would otherwise not impose. The Restatement rule clearly applies to the facts of this case. Once the duty is established, it is up to the jury to sort out the facts and determine if SGC was negligent.

Because there remains a genuine issue material fact as to whether the conduct of SGC was negligent in the timeliness of its warning, having undertaken the task of warning golfers of the threat of approaching storms, I respectfully dissent.