No. 93,013

MATTHEW PATRICK SALL, by and through his natural parents, guardians, and conservators, KAY SALL and DAVID SALL, and KAY SALL and DAVID SALL individually, *Appellants*, v. T'S, INC., d/b/a/ SMILEY'S GOLF COMPLEX, *Appellee*.

(136 P.3d 471)

Opinion filed June 23, 2006.

*Bryson R. Cloon*, of the Cloon Law Firm, of Leawood, argued the cause and was on the briefs for appellants.

*Steve R. Fabert*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, argued the cause, and *Patrick G. Copley*, of the same firm, and *Richard T. Merker*, of Wallace, Saunders, Austin, Brown & Enochs, Chtd., of Overland Park, were with him on the briefs for appellee.

The opinion of the court was delivered by

DAVIS, J.: Plaintiffs Matthew Patrick Sall (Patrick), by and through his natural parents, guardians, and conservators, Kay Sall and David Sall, and Kay Sall and David Sall, individually (collectively the Salls), brought a negligence action against defendant T's, Inc., d/b/a Smiley's Golf Course (SGC) for injuries Patrick sustained after being struck by lightning while on the grounds of the defendant's golf course. The district court granted summary judgment to SGC, and the Court of Appeals in a split decision affirmed, concluding that SGC owed no duty to protect its patrons from lightning strikes. *Sall v. T's, Inc.*, 34 Kan. App. 2d 296, 307, 117 P.3d 896 (2005). We granted the Salls' petition for review and reverse and remand for trial.

On June 14, 2001, Patrick and his friend, Christopher W. Gannan (Chris), decided to go golfing. However, by that afternoon, the sky had turned stormy.

On June 14, Thad Borgstadt, the morning manager for SGC, opened the golf complex as usual. Because the noon television forecast indicated possible storms moving into the area, Borgstadt checked the weather periodically by walking outside and visually checking. Borgstadt testified that he visually checked the weather every 10 to 15 minutes because that was SGC's policy. At approximately 1:15 p.m., Borgstadt noticed dark clouds in the sky and decided to close the complex.

Due to the severe weather, the complex remained closed at 3 p.m. when Jeff Tull, the afternoon manager, replaced Borgstadt. By 3:50 p.m. Tull noticed the skies were clearing, and radar images on the computer in the pro shop showed the thunderstorms were moving out of the area. In another 5 to 10 minutes, the sun came out and Tull opened SGC to the public at 4 p.m.

Patrick and Chris also noticed the weather had cleared. Patrick called SGC to verify that the complex was open. When Patrick's mother questioned him about playing golf after thunderstorms had been in the area, he replied, " 'Mom, don't worry; they wouldn't be open if it wasn't safe.' "

Chris estimated they paid their green fees at approximately 4:45 p.m. and arrived at the first tee shortly before 5 p.m. The pair noticed it had started to sprinkle while they walked to the second tee. According to Chris, they discussed whether storms might be moving back into the area. They also discussed the fact that SGC would blow an air horn as a signal to return to the clubhouse in the event of dangerous weather. Chris was familiar with SGC's method of warning golfers because he had been called back to the clubhouse by the sound of an air horn on at least one prior occasion.

By the time Patrick and Chris started putting on the second green, it started raining a little harder. Chris saw a lightning bolt off to the west, but it was far enough away that they were not concerned. According to Chris, it was understood between them that they would finish the hole and start walking back to the clubhouse.

According to Tull, SGC's policies or procedures for inclement weather call for the manager on duty to monitor the local television

stations, radar images on the Internet, and visually inspect the weather by stepping outside. SGC also has a weather radio. Although there is no policy concerning the frequency with which the managers check weather conditions, Tull admitted that it is checked more frequently when storms are in the area. If the manager determines it is necessary to bring golfers in off the course, the procedure is to sound an air horn.

At approximately 4:50 to 4:55 p.m., Tull checked the weather on the Internet. While he waited for the radar image to load on the computer, an employee informed him a television news teaser had just reported that storms were moving back into the area. Tull returned to the computer screen which showed storms to the southwest of SGC. Tull walked outside to visually check the weather and noticed dark clouds and lightning to the southwest of the complex. He immediately walked back inside, grabbed the air horn, stepped outside, and sounded the horn for two 7-or 8-second periods. Tull estimated he sounded the air horn at approximately 4:57 to 4:58 p.m. At the time Tull sounded the horn, there were three golfers on the course: Patrick, Chris, and a sole golfer, Toby Mills.

Chris was holding the flag for the second hole when he saw a second bolt of lightning in the same location where he had seen the first lightning bolt. About the same time, Chris and Patrick heard the air horn. Patrick finished his putt, Chris replaced the flag, and they started walking back to the clubhouse. According to Chris' deposition testimony, this all occurred in a matter of seconds. As the pair were walking on the second green, Chris saw a flash and heard a loud boom. Chris was knocked unconscious for an unknown length of time. When he came to, he saw Patrick laying face down and unresponsive. Chris returned to the clubhouse for help; however, he estimated it took him 5 to 10 minutes to get back to the clubhouse because of his own injuries. When Chris arrived at the clubhouse, he asked someone to call 911. The 911 call was received between 5:16 and 5:17 p.m. Patrick never fully recovered from his injuries, and he now requires total care.

The Salls brought a negligence action against SGC. After full discovery, SGC filed a motion for summary judgment. In its ruling

from the bench, the district court found there were questions of fact as to whether SGC was negligent; however, the case turned on whether SGC had a duty to protect its patrons from lightning-related injury, a legal question. The court determined a business has no duty to protect or warn patrons of lightning because a lightning strike is not foreseeable. The court also alluded to cost considerations for businesses versus the risk involved. Regarding an assumption of duty under Restatement (Second) of Torts § 323 (1964), the judge stated: "I struggled with the Section 323 issue frankly, but I need to make a finding and I find that the facts in this case are insufficient to invoke the benefits of Section 323." The district court granted SGC's motion for summary judgment.

The Salls appealed from this decision, and a majority of the Court of Appeals affirmed in *Sall v. T's, Inc.*, 34 Kan. App. 2d 296. The majority determined: (1) lightning is not a foreseeable risk; (2) SGC did not breach any standard of care by failing to have a lightning detection system; (3) SGC had no duty to foresee lightning but, if it had a duty, there was no breach because SGC provided approximately 10 minutes' notice; Patrick and Chris saw the lightning themselves yet chose to remain on the golf course, and there was no evidence the air horn was not sounded early enough; and (4) because SGC was not negligent, Restatement (Second) of Torts § 323 is inapplicable. 34 Kan. App. 2d at 300-08.

Judge Patrick D. McAnany dissented. In his opinion, SGC undertook the duty to sound a warning and there remained questions of fact whether SGC did so in a timely fashion or in an untimely, negligent fashion. 34 Kan. App. 2d at 310-11 (McAnany, J., dissenting).

In their petition for review to this court, the Salls raised three issues: (1) The Court of Appeals erred in its conclusion that Restatement (Second) of Torts § 323 did not apply under the facts of this case; (2) the Court of Appeals erred in its conclusion that a lightning-related injury was not foreseeable as a matter of law and thus SGC owed no duty to Patrick Sall; and (3) the Court of Appeals erred in its conclusion that the evidence was insufficient, as a matter of law, to establish the existence of a local industry standard that required the use of lightning detection equipment.

The primary issue in this case is whether SGC has a duty to protect its patrons from the harm caused by lightning strikes on its premises. As set forth below, this question is one of law and our standard of review is de novo just as is our review of the summary judgment entered in this case. Without a duty there can be no negligence, which is the gist of Sall's cause of action. The issue of whether SGC exercised due care only arises if it is determined that SGC owed a duty to its patrons. Both the district court and the Court of Appeals determined that there was no duty as a matter of law. The Court of Appeals further concluded that if a duty existed, SGC did not breach its duty. Thus, we examine the question of whether a duty existed, and if it did exist, whether the facts in the case are disputed requiring that we reverse and remand to the district court.

### *Did SGC have a duty to protect its patrons (Patrick Sall) from the harm caused by lightning strikes on its premises?*

#### *Standard of Review*

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002).

" 'In a negligence action, summary judgment is proper if the only questions presented are questions of law. To recover for negligence, the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact.' " *Schmidt v. HTG, Inc.*, 265 Kan. 372, 396-97, 961 P.2d 677, *cert. denied* 525 U.S. 964 (1998) (quoting *Honeycutt v. City of Wichita*, 251 Kan. 451, Syl. ¶ 8, 836 P.2d 1128 [1992]).

See *South v. McCarter*, 280 Kan. 85, 94, 119 P.3d 1 (2005); *Roe v. Kansas Dept. of SRS*, 278 Kan. 584, 592, 102 P.3d 396 (2004).

## Duty of Care

In its summary judgment, the trial court determined that no duty existed and SGC was entitled to judgment as a matter of law. In arriving at its decision, the trial court considered the duty that may arise from SGC being a possessor of land, governed by Restatement (Second) of Torts § 314A(3) (1964), and the duty that may arise by SGC assuming the duty to warn its patrons from harm caused by lightning, governed by Restatement (Second) of Torts § 323 (1964). Because we resolve this legal issue under Restatement (Second) of Torts § 323, we do not discuss the question of whether SGC owed its patrons a duty as a possessor of land under Restatement (Second) of Torts § 314A(3).

### SGC's Assumption of Duty Under Restatement (Second) of Torts § 323 (1964)

Restatement (Second) of Torts § 323—Negligent Performance of Undertaking to Render Services, provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he [or she] should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his [or her] failure to exercise reasonable care to perform his [or her] undertaking, if,
 (a) his [or her] failure to exercise such care increases the risk of such harm, or
 (b) the harm is suffered because of the other's reliance upon the undertaking."

The trial judge resolved this issue in favor of SGC but not without some difficulty:

"With respect to the Restatement of Torts Section 323, I struggled with the Section 323 issue frankly, but I need to make a finding and I find that the facts in this case are insufficient to invoke the benefits of Section 323."

In affirming the trial court, the Court of Appeals rejected the application of the Restatement (Second) of Torts § 323 to the facts of this case. However, the basis upon which the Court of Appeals rejected § 323 was erroneous. In its majority opinion, the Court of

Appeals concluded that if a duty existed, it was not breached, based upon its own findings of fact:

"By all accounts, SGC provided its customers with approximately 10 minutes' notice that lightning had been seen in the area. Gannon and Patrick saw the lightning themselves and chose to remain on the golf course. There is no evidence that SGC's horn was not sounded early enough to allow all golfers to reach the safety of the clubhouse. Such action does not make SGC negligent." 34 Kan. App. 2d at 306.

Later in its opinion when discussing the application of § 323, the Court of Appeals, relying on its own factfinding, concluded:

"At the onset, we note that § 323 is, at its heart, focused on theories of negligence. *We have already determined that SGC did not act negligently.* Consequently, an individual must fail to exercise reasonable care before the Restatement may be applied to the particular facts of a case. In this aspect, we agree with the trial court that there are insufficient facts here to invoke the protections of § 323, as SGC did not fail to exercise reasonable care." (Emphasis added.) 34 Kan. App. 2d at 307.

The Court of Appeals sits not as a finder of fact but as an appellate court. In this case, its majority conclusion that if a duty existed under Restatement (Second) of Torts § 323 it was not breached based upon its own factfinding is inconsistent with its function as an appellate court "to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought." *Bracken,* 272 Kan. at 1275. Other instances are discussed more fully below where the majority of the Court of Appeals makes findings of fact contrary to the required standard of review.

The error by the Court of Appeals' majority in concluding that if a duty existed SGC was not negligent accounts for its conclusion that Restatement (Second) of Torts § 323 did not apply. Its conclusion that negligence must be found before § 323 may be applied is an incorrect statement of law. Judge McAnany in his dissent highlights the reason why:

"[I]f one must show negligence before the Restatement rule [§ 323] applies, the Restatement rule becomes utterly meaningless since to establish negligence there must be the breach of a duty. To the contrary, the Restatement rule is simply a vehicle for recognizing a duty which, but for the conduct of the defendant, the law would otherwise not impose." 34 Kan. App. 2d at 311.

The question to be asked in regard to an analysis under Restatement (Second) of Torts § 323 is not one concerning whether the facts of the case establish or fail to establish negligence but rather whether there are facts in the record to warrant application of Restatement (Second) of Torts § 323.

In his dissent, Judge McAnany concluded that SGC did undertake the task to warn its patrons of the impeding severe storm and that the real question was whether SGC did so in a timely fashion or in an untimely, negligent fashion. He further stated:

"I am not a proponent of an expansion of the common law at the margins by imposing an absolute duty upon golf course operators to protect their patrons from lightning strikes. However, there is a clear, logical place in the interstices of the common law for applying the Restatement to the facts before us. That was done in *Maussner* when the court announced: 'We find that when a golf course has taken steps to protect golfers from lightning strikes, it owes the golfers a duty of reasonable care to implement its safety precautions properly.' [*Maussner v. Atlantic City Country Club, Inc.,*] 299 N.J. Super. [535, 553, 691 A.2d 826 (1997)].

"Similarly, although the court in *Seelbinder v. County of Volusia*, 821 So. 2d 1095, 1097 (Fla. 2002), found no liability based on a lack of causation (the storm that produced the lightning was not the storm the defendant undertook to warn against), the court recognized: 'If any duty to warn exists, it arises from the County's having undertaken to provide warnings of lightning to beachgoers. Having undertaken this responsibility, the County was obliged to exercise reasonable care in so doing.'

. . . .

"Finally, the majority opinion concludes that the Restatement rule does not apply because SGC is not negligent. I confess I am not wise enough to arrive at this conclusion regarding negligence without the opportunity to weigh the credibility of the witnesses on the various conflicting factual contentions and expert opinions. I defer to the jury on those issues, and so should the district court. Further, if one must show negligence before the Restatement rule applies, the Restatement rule becomes utterly meaningless since to establish negligence there must be the breach of a duty." 34 Kan. App. 2d at 310-11. (McAnany, J., dissenting).

This court recently discussed the requirements for an undertaking under § 323 in *South v. McCarter*, 280 Kan. at 94, and *Cunningham v. Braum's Ice Cream & Dairy Stores*, 276 Kan. 883, 891, 80 P.3d 35 (2003).

In *South*, plaintiff Isaac South was injured during a physical altercation with Joshua Mills and James McCarter in the mobile home park where South and McCarter lived with their parents. South's parents brought suit against the mobile home park, and the district court granted summary judgment in favor of the park reasoning it was not negligent as a matter of law and was not the legal cause of the plaintiff's injuries.

On appeal, the plaintiffs argued in part that the mobile home park owed them a duty and was negligent in rendering the service it recognized as necessary for the protection of the South family under the rental agreement and mobile home community guidelines under both Restatement (Second) of Torts § 323 (1964) and Restatement (Second) of Torts § 324A (1964). We found the rental agreement and community guidelines did not impose a duty on management to provide protection to the tenants and, therefore, they could not in themselves demonstrate an undertaking. 280 Kan. at 98-99.

The only evidence of any sort of undertaking was a letter that the mobile home park's attorney had sent to McCarter nearly 2 years prior to the altercation banning him from the premises. In determining whether the letter constituted an undertaking to render services, we explained:

"A defendant's agreement or affirmative act indicating a willingness to provide services is a threshold requirement for such a duty to arise. *Cunningham*, 276 Kan. at 894. The extent of the undertaking defines the scope of the duty. *McGee v. Chalfant*, 248 Kan. 434, 442, 806 P.2d 980 (1991).

"In making this determination, we have looked at how the 'undertaking' language is applied in both § 323 and § 324A cases. Aside from *Circle Land* [& *Cattle Corp. v. Amoco Oil Co.*, 232 Kan. 418, 657 P.2d 532 (1983),] and *Burgess* [*v. Perdue*, 239 Kan. 473, 721 P.2d 239 (1986)], in most cases we have not found an undertaking sufficient to give rise to a duty. See, *e.g.*, *Roe v. Department of SRS*, 278 Kan. 584, 595, 102 P.3d 396 (2004) (SRS undertaking to monitor services provided by the Bureau of Indian Affairs and county mental health center was only a limited or incidental undertaking which did not give rise to a § 324A duty); *Cunningham*, 276 Kan. at 896 (emergency action plan was not a sufficient undertaking where it did not speak to the situation presented); *Honeycutt v. City of Wichita*, 251 Kan. 451, 466-67, 836 P.2d 1128 (1992) (school district's handbook that safety patrol should be stationed at railroad crossing as needed was not an affirmative assumption of a duty to provide safety patrol at railroad so as to con-

stitute an undertaking); *Geiger-Schorr v. Todd*, 21 Kan. App. 2d 1, 901 P.2d 515 (1995) (KAAMCO had not undertaken to inform nondirectly insured physicians about certain malpractice coverage)." 280 Kan. at 109.

We concluded that no undertaking had occurred because there was no indication the purpose of the letter was to protect the residents from McCarter. The letter was not an undertaking to address the situation presented, *i.e.*, to protect the mobile home residents from future physical harm by McCarter but, rather, was an undertaking in response to a complaint by a resident about noise in the mobile home park. 280 Kan. at 109-10.

In *Cunningham*, the plaintiff customers of the defendant's ice cream store brought a negligence action against the defendant after its employees shooed them out of the store into the path of a tornado. They were injured while driving home when the tornado threw a truck into their car. The defendant's employees were aware at that time that a tornado warning was in effect and had heard reports of a tornado sighting in the area. Additionally, the defendant had an emergency action plan that " 'if a tornado is sighted, or a Civil Defense warning sounds, anyone not wishing to leave should be directed to the "milk room." ' " 276 Kan. at 885. The employees did not tell the plaintiffs about the tornado warning or the emergency action plan.

On appeal, the plaintiffs argued in part that summary judgment was inappropriate because a duty arose under Restatement (Second) of Torts (1964), quoting § 323 but citing § 324A. We found there was no undertaking because the plan did not speak to the situation that occurred. Employees may have known of threatening weather some distance from the store, but a tornado was not sighted and there were no audible sirens. In this situation, the plan did not compel any particular action by the employees. 276 Kan. at 895. Regarding the requirement under § 323 that the physical harm resulting from failure to exercise reasonable care to perform an undertaking increase the risk of harm or harm is suffered because of another's reliance upon the undertaking, we concluded that because of the capricious nature of tornadoes, it could not be said that the plaintiffs were any safer in the milk room than some-

where else and there was no evidence the plaintiffs relied upon the emergency action plan. 276 Kan. at 896.

In this case, viewing the facts in a light most favorable to plaintiffs, SGC had a policy or procedures in place which undeniably were for the protection of their patrons in the event of threatening inclement weather. Dennis Tull, the owner of SGC, gave deposition testimony that SGC has no training manual but it is the policy or procedure for SGC managers to monitor weather conditions by means of local television, a weather radio, Doppler radar images from the Internet, and visual inspection of the weather. It is up to the manager to determine when inclement weather requires sounding an air horn to bring golfers in off the grounds of the complex. There is also signage at the counter in the clubhouse and on the course explaining what golfers should do in the event of inclement weather.

Jeff Tull, the manager on duty at the time of the incident, gave deposition testimony that SGC had no instructional sheet or training manual on weather monitoring. He indicated SGC's weather warning system consisted of a weather radio, local television programing, checking the weather on the Internet, and going outside to visually check the weather. He stated the responsibility for checking the weather rests with the manager and, though there is no policy on how frequently to check the weather, if storms are in the area the managers do check the weather more frequently. Thad Borgstadt, the morning manager, gave deposition testimony that if there were storms moving into the area, it is policy to check the weather every 10 to 15 minutes. Borgstadt also gave a statement where he indicated that all managers are trained on SGC's inclement weather protocol and that there is a printed sheet with instructions.

SGC argues a voluntary undertaking never occurred because there was no agreement to provide weather forecasts to Patrick and there was no undertaking to use extraordinary methods of predicting and reporting the approach of inclement weather. SGC also maintains *South* and *Cunningham* stand for the proposition that no duty arises under § 323 without an enforceable contractual agreement or promise communicated to the patron.

As in *Cunningham*, there is no manual or printed instruction sheet regarding SGC's policy in the record on appeal. By all accounts, SGC had a policy in place which required the manager on duty to monitor weather conditions via a television, weather radio, Internet radar images, and human observation. It does not appear that there was a set frequency with which managers were to check the weather except when storms are in the area, and then the managers are to check the weather every 10 to 15 minutes or, at the minimum, they are to check the weather conditions more frequently. There is no evidence indicating any policy regarding when to signal golfers to return to the clubhouse in the event of threatening weather beyond the use of common sense.

SGC undertook to monitor weather conditions and warn golfers to come in off the course when the manager on duty deemed it prudent. There was no suggestion that SGC undertook to provide any weather forecast to their patrons, and the scope of their undertaking was limited to whatever affirmative acts SGC undertook. See *South*, 280 Kan. at 109. Unlike the situation in *South* and *Cunningham*, SGC's policy was undertaken to address the situation presented, protecting or warning golfers of inclement weather which included the threat of lightning. Because § 323 allows a voluntarily assumed undertaking, it would not follow that the duty could only arise from an enforceable contractual agreement or promise as SGC suggests. If there is any requirement for a communicated promise, it would flow from the requirement that the plaintiff relied on the undertaking to his or her detriment.

The Court of Appeals' majority stated that it did not believe any court in the country has relied on § 323 to impose liability for a golf course lightning injury, but then stated: "In *Maussner*, the club did not use reasonable care to *implement its safety precautions* and that is why the court found the club liable." (Emphasis added.) 34 Kan. App. 2d at 308. Implicit in the New Jersey court's decision was its reliance on Restatement (Second) of Torts § 323 (1964) and that a determination of whether the club was negligent in its undertaking was an issue for the jury. *Maussner v. Atlantic City Country Club, Inc.*, 299 N.J. Super. 535, 556, 691 A.2d 826 (1997), stated:

"What is clear is that here the Club assumed a duty to warn its business invitees. The existence of safety techniques and safety precautionary devices and the possibility that there is an industry standard will establish the parameters within which a jury should determine whether defendant reasonably exercised the duty that it assumed."

Judge McAnany's dissent in this case refers to the decision in *Seelbinder v. County of Volusia*, 821 So. 2d 1095 (Fla. 2002). In *Seelbinder*, the plaintiff was seriously injured when she was struck by lightning while standing on the beach in Volusia County, Florida. Plaintiff and her family were aware of a storm moving in from the south, but it was far enough away that they did not worry about it. They ultimately decided to pack up and leave when it started to sprinkle and they could see the sky was dark to the south, though the sky overhead was still clear. Plaintiff was struck by lightning 15 to 20 minutes later.

The county had a policy where officers monitored the weather, and, if a lightning storm approached the beach, the lifeguards were radioed to go on "red light." Red light called for the lifeguards to direct beachgoers away from the water and toward the parked cars, hotels, and condominiums. The Florida court found the county had undertaken to give beachgoers warnings of the risk of lightning based on human observation and weather station monitoring. However, the case was not allowed to go to a jury on the issue of negligence because the court found no evidence that the county lifeguards were negligent. This was based in part on the fact that the storm that produced the lightning that struck the plaintiff was not the same storm to the south which plaintiff alleged the county untimely warned her of. See 821 So. 2d at 1098.

If SGC failed to act reasonably in regard to this undertaking, the rule also requires that the failure to exercise such care increases the risk of such harm, or the harm is suffered because of another's reliance upon the undertaking. See *Cunningham*, 276 Kan. at 896. *Cunningham* discussed the cases that have applied Reinstatement § 323, by stating:

"Several later cases examining § 323 also guide us in evaluating the facts before us. Among them, *Burgess v. Perdue*, 239 Kan. 473, 721 P.2d 239 (1986), is alone in recognizing the existence of a duty.

"In *Burgess*, a physician voluntarily undertook to relay information between the mother of a deceased patient and the county coroner regarding the mother's desire that an autopsy be limited. The physician failed to communicate the parameters of the mother's consent, and the mother sued for outrage and negligent infliction of emotional distress when she learned that an autopsy of her son's brain had been conducted and his body buried without it.

"With regard to whether a duty arose under § 323, we said:

" ' "In most of the cases finding liability, the defendant has made the situation worse, either by increasing the danger, by misleading the plaintiff into the belief that it has been removed, or by depriving him of the possibility of help from other sources. Many of the decisions state that some such element is necessary, and that there can be no liability where the conduct in no way aggravates the situation or misleads the plaintiff, and he is left no worse off than he was before. . . ." ' 239 Kan. at 481 (quoting Prosser and Keeton on Torts, § 56, pp. 381-82 [5th ed. 1984]).

"We further stated:

" 'In the present case, [the mother] was misled as to the status of the autopsy. She could have acted on her own to prevent the brain autopsy had she not believed [the doctor] had taken care of the matter. While [the doctor] did not directly handle the body during the autopsy, he, at least, provided apparent authority for the coroner to proceed with a full autopsy. Though [the doctor] received no monetary or other type of benefit from the performance of the autopsy, he did take on the responsibility to relay the mother's request for a partial autopsy to the coroner.

" 'The trial court correctly reasoned that [the doctor] created the situation which resulted in the alleged injury. The doctor assumed a duty which he was not required to assume. He did not follow through. Once performance was begun, [the doctor] owed a duty of care toward the plaintiff.' 239 Kan. at 481-82.

"In contrast to *Burgess*, in three other cases either we or a panel of our Court of Appeals has held that no § 323 duty arose under the facts.

"In *Wicina v. Strecker*, 242 Kan. 278, 747 P.2d 167 (1987), we rejected the claim that a private high school and other defendants which had obtained medical insurance for student athletes had a duty to obtain disability insurance as well. 'The defendants' failure to purchase disability insurance did not increase the risk of the plaintiff being injured while playing football nor did the plaintiff rely on the defendants' promise to purchase disability insurance when he decided to play football. Therefore . . . § 323 does not apply here because plaintiff did not rely on any affirmative action taken by the defendants.' 242 Kan. at 285-86.

"In *Geiger-Schorr v. Todd*, 21 Kan. App. 2d 1, 8, 901 P.2d 515 (1995), a panel of our Court of Appeals rebuffed the plaintiff physician's attempt to invoke § 323. The court relied on evidence that any injury she suffered from not being told to purchase certain malpractice coverage was not 'physical,' that defendant Kansas Medical Mutual Insurance Company had not assumed any duty to provide notice

to her, and that she had not relied on a later statement reassuring her about additional insurance. 21 Kan. App. 2d at 9-11.

"In *Chadwell v. Clements*, 18 Kan. App. 2d 84, 847 P.2d 1344 (1993), an earlier Court of Appeals panel declined to apply § 323 to hold that a duty existed on the part of an employer. In that case, the plaintiff employee was injured by a motorist while the employee was using a marked crosswalk that connected a parking lot to the employer's aircraft plant. Although the employer had sometimes used a security guard on the street to control traffic, the plaintiff had not relied on the guard. In addition, the panel was not persuaded that the employer exercised a level of control over the public street that would be necessary to create liability. 18 Kan. App. 2d at 90-91." *Cunningham*, 276 Kan. at 892-94.

SGC suggests the golfers did not rely on Tull to warn them of lightning because the golfers already saw the lightning. They also suggest there is no evidence SGC even knew of the approaching storm.

The Salls contend the evidence shows Patrick and Chris relied on SGC's undertaking because: (1) before going to the golf course on the day of his injury, Patrick called SGC to verify the complex was open given the weather conditions earlier in the day; (2) Patrick's mother questioned Patrick about the safety of playing that day and Patrick replied, " 'Mom, don't worry; they wouldn't be open if it wasn't safe' "; (3) during the course of playing the second hole, Patrick and Chris discussed whether storms might be moving back into the area and discussed the fact that SGC had a warning system for dangerous weather and they would blow the air horn to warn them to come back to the clubhouse if dangerous weather was in the area; (4) Chris had played at SGC on many occasions and on at least one occasion he had heard the air horn and returned to the clubhouse because of dangerous weather; and (5) Chris' affidavit stated that both he and Patrick were relying on SGC to blow the air horn to warn them if dangerous weather was moving into the area. The Salls further contend Patrick was harmed because of his reliance on SGC's warning horn because he was struck by lightning approximately 2 to 3 minutes after the horn sounded.

In his dissent opinion, Judge McAnany found that when the evidence was viewed in a light most favorable to the Salls, the evidence disclosed:

"Tull, SGC's manager, did not check for weather information from approximately 3:50 p.m. until approximately 5 p.m. At 4:25 p.m. a weather advisory was issued on weather radio warning that fast-moving thunderstorms were approaching the area. SGC failed to take note of this warning, however, since the weather radio was apparently set on the 'alert mode,' which only sounds a warning in the event of a tornado or large hail. Had the radio been properly set, it is likely that SGC would have heard the 4:25 p.m. weather advisory.

"Patrick and Chris paid their greens fee and teed off at the first hole between 4:45 p.m. and 4:50 p.m. Chris saw two lightning strikes off to the west before the warning sounded. Leslie Lemon, a meteorologist specializing in radar, calculated that Tull sounded the storm warning horn at 5:04 p.m. Patrick was struck by lightning at 5:06 p.m. It took Chris 5 to 10 minutes to get back to the clubhouse after Patrick was struck." 34 Kan. App. 2d at 309.

Viewed in a light most favorable to the Salls, Chris' deposition testimony showed that he and Patrick were relying on SGC's policy of using air horns to signal golfers to return to the clubhouse in the event of inclement weather. As in *Burgess*, Patrick and Chris could have acted on their own to protect themselves by returning to the clubhouse at the first indication of severe weather returning to the area and, possibly, by not even playing golf because of the earlier weather conditions. SGC increased the risk of Patrick and Chris being injured by a lightning strike by the delay in sounding the air horn. There may be a dispute whether Patrick and Chris relied on SGC's warning before returning to the clubhouse because of their own awareness of the weather conditions; however, SGC was in a superior position to determine when it was prudent for golfers to come in for their safety because the managers relied on more than human observation which is all Patrick and Chris could use for their own safety.

The Court of Appeals' majority frequently referred to the fact that there was "play at [your] own risk" language on SGC's scorecard and signs stating similar language, although there was some dispute as to whether these warning signs were present before the accident. The majority stated the " 'play at [your] own risk' language is similar to that used in *Maussner*, and it would theoretically, under that decision, absolve SGC from liability for golfer injuries due to inclement weather. [Citation omitted.]" 34 Kan. App. 2d at

305. The majority also suggested that this language played a part in its decision that SGC was not negligent.

There is nothing in the *Maussner* decision which would suggest the golf course would be absolved of liability had it displayed "play at your own risk" warning signs. Following its conclusion that the golf course had a duty of reasonable care to implement its safety precautions properly, the court in *Maussner* stated its holding had the following consequences: "If, however, a golf course chooses to utilize a particular safety feature, it owes a duty of reasonable care to its patrons to utilize it correctly." 299 N.J. Super. at 553-54.

In this case SGC chose to utilize a particular safety feature and owed a duty of reasonable care to its patrons to utilize it correctly. To the extent the Court of Appeals' majority suggests that a "play at [your] own risk" warning equates with a golfer assuming the risk of lighting strikes, the common-law assumption of risk doctrine is restricted to cases involving employer-employee relationships. See *Tuley v. Kansas City Power & Light Co.*, 252 Kan. 205, 210, 843 P.2d 248 (1992). Finally, SGC did not rely on the posting of warning signs to absolve itself of liability, and the district court did not rely on the signs as a basis for its summary judgment decision.

### *Do Material Factual Disputes Prevent the Entry of Summary Judgment?*

In their petition for review, the Salls contend the Court of Appeals' majority did not apply the correct standard of review for summary judgment because it did not view the facts in their favor and largely ignored the facts surrounding SGC's weather-warning system. According to the Salls, the majority inexplicably concluded that there was compelling evidence that Patrick waited 10 minutes before heading back to the clubhouse after hearing the horn, and the majority, for the most part, ignored the conflicting expert testimony.

As noted above, there were disputed material facts and the majority did not always view the evidence in the Salls' favor. The majority stated: "It is undisputed that [Chris] Gannan and Patrick continued to golf, even after Gannan spotted lightning off in the distance. There is compelling evidence that Patrick did not im-

mediately head to the clubhouse after hearing the horn, but lingered on the golf course for as long as 10 minutes." 34 Kan. App. 2d at 306.

The facts viewed in the Salls' favor show that Patrick and Chris responded to the air horn in a timely manner. In Chris' deposition testimony, he indicated that he had finished his putt and was holding the flag for Patrick when he saw the second bolt of lightning about the same time they heard the horn. Patrick finished the putt, and they headed back to the clubhouse. According to Chris, this took a matter of seconds. The only possible source for finding Patrick and Chris lingered on the golf course after hearing the horn was the deposition testimony of Jeffrey S. Hartzler, the City of Lenexa detective who responded to the accident. According to Hartzler, Jeff Tull told him that Toby Mills, the only other golfer on the course besides Chris and Patrick, was playing the sixth hole when Mills heard the horn and he returned immediately to the clubhouse. On the way, Mills allegedly passed Chris and Patrick while they were walking toward the green for the second hole. Mills allegedly looked at them and wondered why they were still golfing. However, according to Mills' deposition testimony, he saw Patrick and Chris getting ready to tee off on the second hole as he was playing the fifth. Mills stated he had just teed off on the seventh hole when he heard the horn, that he did not immediately return to the clubhouse, and, more importantly, he never saw Patrick and Chris on his way back to the clubhouse.

The Court of Appeals' majority stated that "due to delays with computerized radar images, it was likely that the thunderstorm cell which produced the lightning bolt that injured Patrick was not visible on radar until after 5 p.m., after the horn had already sounded." 34 Kan. App. 2d at 306. However, according to Tull's own deposition testimony he observed the storm on radar before 5 p.m. SGC's expert, Edmund P. Krider, a professor from the University of Arizona specializing in atmospheric science, stated that radar images are typically delayed 6 to 8 minutes.

The Salls' expert, Leslie Lemon, a meteorologist specializing in radar and severe storms, agreed that radar images are typically delayed approximately 10 minutes. However, it was his opinion that

by 4:35 p.m., SGC should have been able to visually see the storm clouds and radar data showed these storms were moving rapidly. Lemon agreed that the general public would probably not be able to correctly interpret how rapidly the storm was approaching. Lemon's affidavit stated that "any competent person viewing the information available from 2:30 p.m. until the time Patrick Sall was struck by lightning, would have had information showing storms were moving back into the area and the golf course should never have been reopened."

The Court of Appeals' majority found SGC used reasonable care under the circumstances in sounding the air horn, providing its customers with approximately 10 minutes' notice, and, therefore, if SGC had a duty, there was no breach. 34 Kan. App. 2d at 306. Mills estimated the time between hearing the horn and seeing the lightning bolt that struck Patrick was between 8 to 10 minutes. According to Chris, it took him 5 to 10 minutes to get back to the clubhouse after regaining consciousness after the lightning strike. Jeff Tull recalled the 911 call was made between 5:16 to 5:17 p.m.

There was evidence SGC did not timely sound the air horn. Lemon's affidavit stated:

"Based on the lightning strike data and the testimony of Christopher Gannan, it is my opinion that the lightning bolt which struck Patrick Sall occurred at 5:06:29 p.m. and the two bolts that Christopher Gannan saw off in the distance near DeSoto, Kansas occurred between 5:02 p.m. and 5:04 p.m. These are the bolts identified 2-3 minutes before Patrick was struck as stated by Christopher Gannan. Based on the affidavit testimony of Christopher Gannan and the lightning strike data, Jeff Tull sounded the warning at approximately 5:04 p.m."

It was also Lemon's opinion that had SGC's weather radio been monitored and not set on alert mode, management would have had notice of the incoming storm at 4:25 p.m.

According to Bruce Thomas, a meteorologist at KCTV5 Kansas City, on June 14, 2001, the Johnson County and Kansas City metropolitan area had been under a severe thunderstorm watch until 5:20 p.m. At 4:25 p.m. the National Weather Service forecast an area of rain and thunderstorms moving into the metropolitan area with the leading edge moving into Johnson County by 5 p.m. Tho-

mas indicated the NOAA weather radio owners manual states that the radio should be left on monitor mode during stormy weather.

Moreover, it was Edward Wankel's deposition opinion that if SGC had been monitoring the weather with its available system that it would have given approximately 30 minutes' advance warning of the storm and, in his opinion, the complex should never have reopened. It was also Wankel's opinion that having a weather radio on the alert mode during a stormy day is below the acceptable standard of care.

The standard of review for summary judgment has already been stated. Regarding a negligence action, this court has further stated summary judgment is only proper if the only questions presented are questions of law. " ' "To recover for negligence, the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact." ' [Citations omitted.]" *South*, 280 Kan. at 94.

Patrick may have been comparatively negligent for not heeding the weather conditions that were observable to him; however, SGC's liability would be reduced by Patrick's failure to exercise reasonable care pursuant to K.S.A. 60-258a, the comparative fault statute. See *Miller v. Zep Mfg. Co.*, 249 Kan. 34, 43-44, 815 P.2d 506 (1991). Under the comparative fault statute, the jury determines the percentage of fault. See K.S.A. 60-258a(b); *Fitzpatrick v. Allen*, 24 Kan. App. 2d 896, 905, 955 P.2d 141, *rev. denied* 264 Kan. 821 (1998).

As demonstrated above, the Court of Appeals failed to apply the correct standard of review in its determination of facts. In fact in many instances, the majority viewed the evidence in favor of the defendants. While the district court granted summary judgment as a matter of law, it also noted that there were questions of fact regarding whether SGC acted negligently; the Court of Appeals' majority did not disagree with that assessment, even though it subsequently stated that SGC did not act negligently. We conclude, as did the trial court, that material factual issues remain on the issue of whether SGC negligently performed the duty it assumed

under Restatement (Second) of Torts § 323 (1964) to monitor weather conditions and warn its patrons to come in off the golf course when the manager on duty deemed it prudent. Thus, the summary judgment granted to SGC must be reversed and the case remanded for trial.

Reversed and remanded.