NOT DESIGNATED FOR PUBLICATION

No. 127,513

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

THOMAS W. MADDEN, as Heir at Law and Executor of the Estate of THOMAS T. MADDEN,
and JULIE BOECKMAN, Heir at Law of THOMAS T. MADDEN,
*Appellants*,

v.

P&S ELECTRIC and ROUSTABOUT SERVICE, INC., d/b/a P&S SECURITY,
and SHIRLEY LYNN LODER,
*Appellees*.

MEMORANDUM OPINION

Appeal from Rice District Court; STEVEN JOHNSON, judge. Oral argument held February 4, 2025.
Opinion filed April 17, 2026. Reversed and remanded.

*David R. Morantz* and *Richard L. Budden*, of Shamberg, Johnson & Bergman, Chtd., of Kansas
City, Missouri, *Robert Cross*, pro hac vice, *Douglas Letter*, pro hac vice, and *Erin Davis*, pro hac vice, of
Brady United, of Washington, D.C., and *E. Thomas Pyle III*, of Pyle Law, of McPherson, for appellants.

*Jerry D. Hawkins*, of Hite, Fanning & Honeyman LLP, of Wichita, and *Jeffrey M. Malsch*, pro
hac vice, and *Christopher Renzulli*, pro hac vice, of Renzulli Law Firm, LLP, of White Plains, New York,
for appellees P&S Electric and Roustabout Service, Inc., d/b/a P&S Security.

*Patrick J. Murphy*, of Woodard, Hernandez, Roth & Day, LLC, of Wichita, for appellee Shirley
Lynn Loder.

Before COBLE, P.J., SCHROEDER and ISHERWOOD, JJ.

ISHERWOOD, J.:  A family tragedy forms the basis of this heartrending legal battle.
Thomas Madden and Julie Boeckman's (the Heirs) father, Thomas T. Madden (Thomas

1

T.), died at the hands of their brother, David Madden, who then turned a gun on himself on April 29, 2019. One of the guns used in the murder-suicide was purchased by these siblings' mother, Shirley Lynn Loder, from P&S Electric and Roustabout Service, Inc., d/b/a P&S Security. As their father's heirs, Thomas and Julie brought various negligence claims against both Shirley and P&S.

The Heirs now appeal from the district court's summary judgment ruling in which the district court concluded that the Heirs failed to show sufficient evidence for trial on two issues—that P&S could have known Shirley bought the gun for David, and that the gun caused the crime. We must part ways with the district court, as we explain below. First, we conclude that the circumstances of the sale of the firearm, when viewed together and in the light most favorable to the Heirs, present such a material question of fact that the case should proceed to a jury. Likewise, we find the evidence of the firearms present at the crime scene sufficient to present the question of causation to a jury. We reverse the district court's grant of summary judgment and remand the case for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

*David's gun ownership and Shirley's purchase*

The key allegation underlying this case is this: the Heirs claim that Shirley acted as a straw purchaser—that is, bought the gun for David while claiming it was for herself—when she bought a .45 caliber handgun from P&S and gave it to David.

Prior to David receiving this handgun, he had grown up around firearms, as he was a "farm kid," and his father kept shotguns and rifles in the home. David and his brother Thomas would also receive shotguns or rifles for Christmas presents, and their father and grandfather took them hunting.

But David's relationship with firearms changed when in February 2017, law enforcement arrested him on multiple criminal charges. Kansas Bureau of Investigation (KBI) Special Agent Cody Goforth confiscated all firearms from David's residence because he could no longer legally possess them, including a .45 caliber handgun he had carried for years. David was released from jail in May 2017. After his release, his access to firearms became an apparent family concern.

In May 2017, Shirley knew that her son could not legally buy or own a firearm, but she feared for his safety. David had dated a woman named Megan who later went missing. Shirley testified that David heard from people associated with the woman, expressing concern about "the Megan people." Shirley viewed these people as dangerous because they threatened David and blamed him for the woman's disappearance.

Also in May 2017, Richard Loder—Shirley's then husband—discovered that his .45 caliber handgun was missing from a locked box on his filing cabinet. He asked his wife where it was, suggesting that "[s]omebody in this house [had] it." Richard also told David's sister, Julie, about the missing gun. Richard informed her that David had just been released from jail, that Richard's gun was missing, and that Julie should call her father and warn him that David may have taken the gun. Julie's own testimony confirmed Richard's recollection of the missing gun incident.

Days after Richard told Shirley his handgun was missing, Richard found his handgun in the hall closet. Richard testified that he believed Shirley initially took the gun and then put it back after he asked her about it.

Just weeks after the missing gun incident, on July 3, 2017, Shirley bought the .45 caliber handgun from P&S. In later depositions, Shirley testified that she drove to the P&S in Great Bend intending to buy a gun for Richard. She said that David went to Great Bend with her because he had a haircut appointment. Shirley remembered telling P&S

3

manager Rob Roblyer that she was either "looking for a gift" or "looking for a gun." Shirley did not recall David walking in with her, testifying that he was likely outside on the phone or smoking a cigarette. For his part, Roblyer testified that he did not remember the transaction at all.

Shirley browsed through the selection of handguns that Roblyer showed her, eventually selecting the .45 caliber handgun at issue in this case. She completed the required Firearms Transaction Record, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Form 4473, as part of the purchase. Shirley's testimony about David's presence was not entirely consistent. Although she said he did not walk in with her, she testified that, at some point, she could hear David's voice and saw him in the store conversing with other customers. Shirley testified that he "was just kind of wandering around" and she was on her own making the purchase. But Shirley also testified that David "did come up there" and was standing by her, and although she was "not saying he didn't look at the case [or] at guns," she maintained he gave her no information or suggestions about buying a gun while at P&S. Nor did Shirley remember David ever touching the gun while in, or on the way out of, the store.

This was Shirley's first gun purchase, and she took $500 in cash with her to P&S which she used to buy the gun. Why Shirley decided to buy the gun and where the money originated is less than clear from the record. During an interview with the KBI after the shootings, Shirley told KBI agents that she bought the gun for herself, not for David. She also admitted giving the gun to David because she feared for his safety. But in her deposition testimony for this lawsuit, Shirley testified that she saved up money to purchase the gun as a gift for Richard and that it "wasn't David's friend's money. It was [her] money." However, Richard testified that, after her own arrest, Shirley told him that "three guys gave her the money and she bought it."

4

*Straw purchases and Form 4473*

The ATF provides firearms dealers, including P&S, with the "'ATF Federal Firearms Licensee Quick Reference and Best Practices Guide'" (the Guide). The Guide states that Form 4473 is one of the most important tools in identifying straw purchases. Form 4473 is a transaction record which asks the customer, at question 11.a., if they are the actual buyer of the firearm.

Since 2000, the firearms sales industry's primary trade group—the National Shooting Sports Foundation (NSSF)—has partnered with the ATF to prevent and discourage straw purchases through its campaign that includes training on how to spot and stop straw purchases. Judith Bender was a co-presenter in the NSSF training seminar for gun dealers and testified as P&S's expert witness.

Bender explained that a Federal Firearms Licensee (FFL) such as P&S is "'the first line of defense when it comes to straw purchase prevention,'" noting that blocking straw purchases helps prevent guns from being used in violent crimes. Bender's training seminar advises FFLs to train and supervise their employees to detect and stop straw purchases and advises dealers to contact the ATF if they suspect they have just completed or prevented a straw purchase. Bender acknowledged that a "no" answer on Form 4473 should raise concerns about a straw purchase and the dealer should challenge the validity of the transaction and memorialize the discussion with the customer.

Roblyer testified that he would consult the Guide when selling firearms and he agrees with the ATF's advice on protecting the community when selling guns. Roblyer confirmed that it is important for a firearms seller to know who the actual buyer is and question 11.a. on Form 4473 is a tool for determining the actual buyer. The Guide states that if a person answers "no" to question 11.a., then the person "'has given you reason to believe he or she is prohibited and the transaction must stop.'" But other training

materials from ATF to gun sellers have instructions for correcting errors on Form 4473. Roblyer testified that question 11.a. "is worded in a way that confuses people" and "a lot of times we have to clarify" what the question is asking.

KBI Senior Special Agent Brian Carroll testified similarly, saying that gun buyers make mistakes on Form 4473, acknowledging that he once checked the wrong box when buying a gun for himself at P&S. P&S allowed him to correct his error and go ahead with the purchase.

When Shirley completed Form 4473 during her purchase, she answered "no" to all questions under section 11, including question 11.a.—initially answering "no" to whether she was "the actual transferee/buyer" of the gun she purchased. Roblyer pointed out Shirley's answer to question 11.a. and asked her if it was a mistake, causing her to change the answer to yes. They both initialed next to the change. Shirley testified that she checked the wrong box because she found the wording of the question confusing, and it would make sense to her that she was confused by the question because she was buying the handgun intending it as a gift.

Experts for both sides, and P&S employees, described other indicators of a straw purchase besides the answer to question 11.a. Potential red flags of a straw purchase include: (1) the presence of another person who is assisting or hovering near the person buying the gun; (2) large cash purchases; (3) a noticeable mismatch between the size of the buyer and the gun; and (4) the buyer's lack of familiarity with firearms.

In depositions, Roblyer testified that the handgun Shirley bought was a trade-in. He explained that the previous owner was a woman of "normal stature" but he could not say if it was similar to Shirley. He added that P&S sold that model of handgun "all the time" to female customers.

Former ATF official Joseph Bisbee testified as an expert witness for the Heirs. He stated that if P&S suspected a straw purchase, then P&S should have contacted law enforcement. He added that, if law enforcement knew the players involved in this specific purchase, they would have taken the report seriously. But Bisbee acknowledged that buyers may make a mistake answering question 11.a. on Form 4473, and the correction process that P&S used for Shirley's purchase was proper procedure. He also testified that if P&S performed their obligation to satisfy themselves that the purchase was a legal transaction, then they would not violate the ATF's guidance on straw purchases.

Retired ATF Agent Joseph Vince also testified as an expert for the Heirs. He stated that his review of P&S's records showed that "no" answers were rare—specifically occurring in 10 out of 1,232 transactions, or less than 1%, in the year leading up to Shirley's handgun purchase. Vince testified that in his opinion P&S "absolutely should have immediately called" law enforcement about this sale. Like Bisbee, he believed that ATF would have responded to a straw purchase attempt, "[e]specially if they knew that it involved David Lee Madden."

*Shirley gives David the gun.*

The parties substantially dispute when Shirley gave the handgun to David. One indication of the possible transfer was part of the criminal charge lodged against Shirley after the shootings. In January 2021, the Rice County District Attorney charged Shirley with criminal distribution of a firearm, a class A misdemeanor, to which she later pleaded no contest. That complaint charged that Shirley gave David the gun "on or about July 3, 2017 - April 29, 2019." At a plea hearing, the State recited the factual basis for the charge, proffering that Shirley gave David the handgun sometime between an updated date range of June 12, 2018, and April 29, 2019. How these dates were precisely determined in the criminal case is unclear from the record before us.

In her 2022 deposition in this case, Shirley testified that she kept the handgun in her sole possession from the time of purchase—July 2017—until she gave the handgun to David in June 2018 or later. She testified that during that 11-month period, she kept the gun, read the owner's manual, and practiced shooting with it until she could hit a tree. She estimated shooting the gun twice a month during the two-year period between her purchase and the murder-suicide incident.

Thomas testified that he saw David in possession of a handgun as early as the spring of 2018. But neither Thomas nor any of David's family reported David's possession of a firearm.

Bisbee prepared a report as an expert witness for the Heirs and disagreed with the estimation that Shirley kept the gun for a year. He concluded from his review of documents that Shirley must have given the .45 caliber handgun to David shortly after its purchase from P&S. He based this opinion mostly on the timeline that David owned a .45 until his arrest in February 2017, Richard's .45 temporarily disappeared when David got out of jail in May 2017, and then Shirley bought the .45 from P&S in July 2017. Bisbee concluded that Shirley's deposition testimony was not credible about whether the gun was a gift for Richard. Bisbee noted that Richard's birthday was 13 days before the purchase and it would be unlikely that Shirley would have bought it for Richard or told Roblyer that she was buying the gun for Richard.

Vince, as an expert witness for the Heirs, likewise opined that Shirley gave the .45 caliber pistol to David immediately after its purchase in July 2017. Vince reviewed deposition testimony and other documents related to the case before arriving at his conclusion. Like Bisbee, Vince also described a timeline of events suggesting that David had a .45 before he was arrested in February 2017, apparently took a .45 from Richard before returning it, and went with Shirley when she bought the .45 from P&S.

Vince also noted from his professional experience that young, physically fit male and female ATF agents had difficulties safely and correctly discharging pistols which were oversized for them, essentially opining that smaller people have an easier time with smaller guns. He described Shirley as a very petite senior citizen, suggesting that the .45 caliber handgun would have been a difficult first handgun for her. Vince also credited Thomas' testimony that his mother wanted nothing to do with firearms and he had never known her to touch a gun. Shirley would make Thomas move his gun if he leaned it up against the doorway because she did not want to touch it and move it herself. Similarly, Richard testified that his wife did not care for firearms, saying they were "taboo to her." Vince determined from his review of the evidence in this case that David was the one "infatuated with firearms" and Shirley bought the gun from P&S for him.

Vince also included in his report a transcript of Shirley's interview with KBI Agent Goforth from early in the agent's investigation of the murder. In the interview, Shirley told Agent Goforth that she bought the handgun to give to David because she feared for his safety from "the Megan people," but she "still would not have put that gun in his hand if [she] thought he was going to bodily harm someone." Based on this statement, Vince reported that the logical conclusion was that Shirley bought the gun and gave it to David immediately.

*David uses the gun.*

On April 29, 2019, David shot and killed his father before committing suicide at the scene of the murder.

Before the incident, Russell Kocher—Alden Fire Chief and David's cousin—heard on the police and fire scanner about an incident unfolding with David as a possible suspect. Kocher drove to David's home and saw David leave his house. Kocher described him carrying an "'arm load of guns,'" estimating one long gun and five or six other

9

firearms. Kocher followed David to Thomas T.'s house, reporting David's location to Sheriff Bryant Evans. David shot at both Kocher and Sheriff Evans, wounding the sheriff in the leg.

The .45 caliber handgun was one of multiple guns recovered from the scene. KBI tested three of the guns in a forensics lab—those guns believed to have been used by David in the shootings. KBI tested the .45 caliber handgun and a .30-06 rifle for functionality. Shell casings matching those weapons were found at the scene. KBI also tested a .340 Weatherby rifle because David shot Sheriff Evans in the leg with that weapon, which was confirmed through recovery of the bullet. Although police reports referenced David carrying "a basket of guns and ammo," no other weapons were tested in the forensics lab.

In fact, according to Agent Carroll's report, no other handguns were identified on the scene. The .340 Weatherby rifle was jammed with a double feed malfunction, meaning two rounds attempted to feed into the chamber at the same time. The .30-06 rifle was not loaded. A Winchester 12-gauge shotgun was on the floor in the same hallway as David's body. Agent Carroll documented several casings from spent ammunition and live ammunition, especially .45 caliber rounds, but did not document any other guns.

Agent Goforth—who had confiscated David's guns in 2017—was the KBI agent in charge of investigating Thomas T.'s murder. Agent Goforth determined that David used the .45 caliber handgun that Shirley bought to murder Thomas T. He arrived at this conclusion because: (1) the handgun was found under David's body; (2) .45 caliber casings were near the body of Thomas T.; (3) .45 caliber casings were also at the scene where David shot Undersheriff Chad Murphy earlier that day; and (4) there was no other .45 caliber weapon found during the investigation. A forensic autopsy was performed on Thomas T., with the pathologist confirming he died of a gunshot that traveled through his chest and exited his back; but there was no confirmation by the doctor of what type of

bullet was used. Goforth testified that a ".45 caliber round or presumed bullet was discovered with [David] as well as an empty cartridge case," so it was presumed that David shot himself with the same gun.

*Litigation proceedings*

In April 2021, the Heirs filed this lawsuit claiming wrongful death and survival causes of action, stemming from the allegedly negligent and illegal transfer of the firearm purchased by Shirley from P&S and used in the murder of Thomas T. The Heirs made negligence, negligent entrustment, negligence per se, and aiding and abetting claims against both P&S and Shirley. After P&S filed a motion to dismiss the petition pursuant to the Protection of Lawful Commerce in Arms Act (PLCAA), 15 U.S.C. §§ 7901-03, and K.S.A. 60-212(b)(6) of the Kansas Rules of Civil Procedure, the Heirs challenged the constitutionality of the PLCAA.

Following a series of hearings on the dispositive issues, the district court found the PLCAA constitutional. It also found the Heirs' negligence claims (Counts I through III) subject to the PLCAA and qualified under exceptions in 15 U.S.C. § 7903(5)(A) to the immunity granted through the PLCAA and not subject to dismissal. However, the district court found that the facts and allegations in the First Amended Petition did not support their claim against P&S of aiding and abetting (Count IV) and dismissed that claim.

After discovery, the district court granted summary judgment to P&S and Loder. As for the sale, the district court recognized that P&S, as a licensed gun seller, had an obligation to prevent and report a straw sale. The district court added that "if the plaintiff has evidence to show that P&S knowingly sold this gun through a straw sale, the case should go forward." But the district judge reviewed the evidence of red flags supporting the inference of a straw purchase and found that the evidence fell short, concluding, "As a

11

matter of law I cannot find that a reasonable jury would find that these five items were such a red flag that P&S Security should have known that this was a straw sale."

The district court expressly declined to address the question of whether Shirley's purchase was actually a straw sale, saying that the Heirs had sufficient evidence to make it a jury question. "But even if it was a straw sale, and P&S Electric had no reason to know that or to believe that or detect it under their high degree of care, you still can't put liability on them." The district court held that, even considering the five or six red flags together, as a matter of law it could not find that a reasonable jury would conclude those were such red flags that P&S should have known it was a straw sale, giving the example that Shirley's correction to question 11.a. might not be out of the ordinary. Ultimately, it found that there was "insufficient evidence to justify a jury verdict in" the Heirs' favor against P&S as it related to P&S's alleged knowledge of a straw purchase.

The district court found that the Heirs had sufficient evidence to show that the gun which killed Thomas T. was the .45 handgun that Loder bought at P&S. But the district court noted that the gun was one of three guns used during the murder and that David "had far more guns available to him than even the ones that ended up at the scene." The district court concluded that whether Shirley gave that specific gun to David or not, it would not have changed the outcome. For this reason, the court found that the Heirs had no "evidence to present to the jury on the but-for test that [either P&S or Shirley's] negligent act caused the injury incurred" and granted summary judgment to both P&S and Shirley.

The Heirs timely appeal.

ANALYSIS

The Heirs present two claims on appeal, arguing the district court erred in its analysis of (1) P&S's knowledge of any straw sale, and (2) "but for" causation. We examine each claim in turn after first acknowledging the overarching legal framework in which we must decide the issues.

## I. *Applicable legal standards*

The standards applied to a summary judgment ruling are well established.

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and supporting affidavits show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. The district court must resolve all facts and reasonable inferences drawn from the evidence in favor of the party against whom the ruling is sought. When opposing summary judgment, a party must produce evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issue in the case. Appellate courts apply the same rules and, where they find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment is inappropriate. Appellate review of the legal effect of undisputed facts is de novo. [Citation omitted.]" *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981-82, 453 P.3d 304 (2019).

An issue of fact is not genuine unless it has legal controlling force as to the controlling issue. A disputed question of fact which is immaterial to the issue does not preclude summary judgment. In other words, if the disputed fact, however resolved, could not affect the judgment, it does not present a "genuine issue" for purposes of summary judgment. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 934, 296 P.3d 1106 (2013).

Our appellate courts have opined that summary judgment is rarely appropriate in negligence cases, unless the plaintiff fails to establish a prima facie case demonstrating the existence of the four elements of negligence: "existence of a duty, a breach of that duty, an injury, and proximate cause." *Montgomery v. Saleh*, 311 Kan. 649, 653, 466 P.3d 902 (2020); see also *Endsley v. American Drug Stores, Inc*., No. 91,354, 2004 WL 1609203, at *2 (Kan. App. 2004) (unpublished opinion) ("'[S]ummary judgments are to be granted with caution in negligence actions.'"). Normally, causation is a question of fact for the jury. *Najera v. General Pest Control*, 61 Kan. App. 2d 363, 375, 503 P.3d 1054 (2021) (citing *Baker v. City of Garden City*, 240 Kan. 554, 557, 731 P.2d 278 [1987]). But "when the facts of causation 'are susceptible to only one inference, the question is one of law and may be disposed of summarily by the court.'" *Najera*, 61 Kan. App. 2d at 375 (quoting *Baker*, 240 Kan. at 557).

A court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue requires a determination of the state of mind of one or both of the parties. *Hill v. State*, 310 Kan. 490, 520, 448 P.3d 457 (2019).

"A district court judge may not decide disputed issues of material fact on summary judgment, even if the claims sound in equity rather than law." *Stechschulte v. Jennings*, 297 Kan. 2, Syl. ¶ 1, 298 P.3d 1083 (2013).

Before turning to the questions before us, we note that the Heirs advanced several legal theories against P&S and Shirley before the district court, including negligence, negligent entrustment, negligence per se against P&S, negligence against Shirley, and aiding and abetting against Shirley. But the Heirs' appeal focuses on two questions: (1) whether P&S knew or should have known that Shirley was a straw purchaser of the handgun; and (2) whether "but for" causation required the Heirs to disprove that David could have killed Thomas T. with a firearm other than the subject handgun.

14

## II. *Did P&S have actual or constructive notice of a straw purchase?*

First, we address the Heirs' claim that they produced sufficient evidence to present to a jury the question of whether P&S knew or should have known that Shirley was buying the gun for David. P&S argues that Shirley did not purchase the gun for David and that the Heirs failed to present evidence showing that she made a straw purchase. P&S also contends that the Heirs point to red flags—indicators of a straw purchase—that fail to meet the criteria of alerting a seller to a potential straw purchase.

Because this is a negligence case, """summary judgment is proper if the only questions presented are questions of law.""" *Sall v. T's, Inc.*, 281 Kan. 1355, 1360, 136 P.3d 471 (2006). To succeed in their claims, the Heirs must """prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact.""" *Sall*, 281 Kan. at 1360.

Here, the question is one of breach—whether P&S knew or should have known Shirley was a straw purchaser. The district court expressly declined to make a finding on whether the transaction actually *was* a straw purchase, stating only that "the plaintiff probably has enough evidence to take to the jury." Appellees did not cross-appeal the district court's conclusion that there was enough evidence to take the question to a jury, which deprives us of jurisdiction to consider any such argument. *Lumry v. State*, 305 Kan. 545, 553-55, 385 P.3d 479 (2016). Even so, we ultimately agree with the court's conclusion. As explained above, Shirley's self-serving testimony contained conflicts, her credibility is questionable, and P&S employees did not expressly recall the sale. P&S provides no citation to evidence supporting a concrete timeline of significant delay between Shirley's purchase and her transfer to David, while the Heirs rely on expert testimony in significant part to suggest an immediate transfer. Given the importance of the question and the credibility determinations required in deciding the issue, we have no

trouble concluding the question of whether Shirley's purchase was a straw purchase is a fact question for a jury.

Whether P&S should have known about a potential straw purchase given the information available to it at the time of Shirley's purchase is the question before us. The Heirs contend the district court did not properly evaluate the indicators of a potential straw sale that were present during Shirley's purchase of the gun. The Heirs argue the presence of the following red flags: (1) Shirley's answer to question 11.a on Form 4473; (2) David was with Shirley during the purchase; (3) Shirley was a petite, older woman whose stature did not match the size of firearm purchased; (4) she lacked familiarity with firearms; and (5) she paid with cash in the context of the other indicators.

We first find that the district court erred in its statement about Shirley's answer to question 11.a. on Form 4473. The district court found that that the Heirs "have no evidence that [correction of Form 4473] doesn't happen on a daily basis." This is an incorrect recitation of the evidence in the record. P&S presented evidence, through P&S's Assistant Manager Tim Wagner's testimony, that customer confusion about the word "transferee" is "a daily, weekly occurrence." But the Heirs countered that testimony with Vince's report showing P&S made 1,232 firearms sales in the year leading up to this sale with only 10 errors to question 11.a. on Form 4473. That is, these errors occurred in less than 1% of total sales, stating explicitly in his report that this fact undermined Wagner's assertion of a daily or at least weekly error. As a result, the parties' evidence presents a dispute as to whether a mistake on question 11.a. is a rare occurrence. Vince's report also outlined that the "check mark revision for question 11.a was not made by" Shirley, as that mark was distinctively different from the other marks Shirley made on Form 4473. In Vince's opinion, Roblyer made the correction on Form 4473 and had Shirley initial it, which is a violation of the ATF guidelines.

16

The district court's framing could have been better on a tangential point related to Form 4473. In Shirley's depositions, she could not remember whether she told Roblyer that she was "looking for a gift" or "looking for a gun." The difference between these statements matters because the district court needed to weigh all the evidence in favor of the party opposed to summary judgment. If Shirley was buying the gun for Richard, as her brief states and the "gift" comment implies, then her confusion on question 11.a. is more understandable. Roblyer might overlook the mistake as not a red flag if Shirley told him that the gun was a gift for her husband, and she misunderstood whether to mark herself as the transferee. But because her testimony was ambiguous on whether she told Roblyer it was a gift, the district court should have assumed that she did not say it was a gift, since that inference would favor the Heirs.

As for David's presence during the sale, the district court appeared to credit only Shirley's claim that David did not enter the store at the same time as her and assumed only that David was "in the store." But this ignores Shirley's own testimony that, at some point, David stood with her at the counter, looking at guns. Again, given that store employees did not recall the specifics of the transaction and given the sole witness—Shirley's—clear motivation to downplay David's involvement, the district court was required to credit any fact supporting the Heirs' version of events, which Shirley herself supplied. David was a 6-foot-tall former Marine who undeniably was inside the store and even nearby his mother, at some point, who was a petite female senior citizen, standing at 5 foot 2 inches tall, with very small hands.

The district court made contradictory statements regarding Shirley's stature in relation to the size of the gun. The district judge first found the lack of proportionality "extremely speculative," then said the court could not "apply any of [its] personal experience" when discussing it was a "fad for a while" for smaller women to buy .45s, but went on to say, "that's not part of my rulings here." We disagree on the speculative nature of the question. While Roblyer's testimony showed that the prior owner of the gun

17

was also a woman, the parties cited no evidence of the prior owner's stature in relation to Shirley's. Roblyer said the previous owner was of "normal stature" and he did not "know if [he] could say probably similar to Miss Loder." P&S's own expert, Bender, in a presentation on detecting straw purchases, identified a lack of "fit" between a customer and the firearm selected as a potential indicator of a straw purchase. And, when viewing this in conjunction with Shirley's initial answer on Form 4473, we must also consider as part of the record evidence that P&S's assistant manager Wagner testified that he would be suspicious of a possible straw purchase in a situation where a customer wants a firearm that is too big for them *and* that same customer answers question 11.a incorrectly. This demonstrates the importance of considering each potential flag not in isolation, but in the aggregate.

Regarding the cash purchase, we must look not at Shirley's inconsistent statements regarding the origin of the cash but at what P&S employees could have been aware of regarding the use of cash at the time of the transaction. Standing alone, there is no evidence that the use of cash signifies a possible straw purchase; however, Bisbee testified that use of cash in conjunction with other red flags may indicate a straw purchase is occurring.

The record does not reflect whether Shirley told Roblyer she was inexperienced with firearms, although the Heirs' expert testimony suggests Roblyer should have questioned her about such experience, especially considering the presence of other red flags. Even so, given the lack of evidence in the record that P&S had any indication Shirley lacked experience, this indicator weighs less in the Heirs' favor.

Yet the district court's ultimate error is that it appeared to consider each red flag separately rather than in the aggregate. For example, the court blamed the Heirs for "only want[ing] to go on the perception that P&S would somehow know that someone hovering behind the purchaser is a red flag, *with no other indication*." (Emphasis added.) However,

18

this is not at all what the Heirs sought—they asked the court to properly consider all the potential red flags together. The question before the district court was: when considered together, did the circumstances of this transaction, when viewed in the light most favorable to the Heirs, present such a material question of fact that the case should proceed to a jury? We conclude they do.

The Heirs provide caselaw from various jurisdictions and procedural postures to support their position that involvement of the future possessor of a firearm who is also present in the store is a significant factor in determining whether a straw purchase was made. The controlling precedent from our Supreme Court, *Shirley v. Glass*, 297 Kan. 888, 308 P.3d 1 (2013), involved Russell Graham—who could not legally possess a firearm—going to a gun store with his grandmother. Both Graham and his grandmother spoke with the gun store's owner. The owner handed a shotgun to Graham, who examined it. Conflicting testimony disputed whether Graham told the owner of his felony convictions. The owner asked the grandmother if she could legally possess a firearm. The grandmother failed to answer the yes/no questions on Form 4473. Graham paid for the shotgun with cash. And Graham carried the gun out of the store. In less than 24 hours, Graham used that shotgun to kill his 8-year-old son and then himself. 297 Kan. at 890-92. Our Supreme Court ultimately reaffirmed its position that "those in possession of firearms should exercise the highest standard of care in deterring the possession of those firearms by those who are at special risks to misuse the weapons" and allowed Shirley's negligent entrustment action to proceed, reversing the district court's grant of summary judgment. 297 Kan. at 901.

In *United States v. Carney*, 387 F.3d 436 (6th Cir. 2004), David Johnson, a felon, on at least nine distinct occasions bought automatic or semi-automatic handguns and rifles from Patrick and Sean Carney accompanied with one of six different women Johnson used as straw purchasers. Each time, Johnson transported a woman to the Carneys' gun store and selected firearms in the absence of any participation by his

19

feminine cohort. Instead of participating, Johnson's accomplice would pass the time playing with the store owners' pets, smoking cigarettes outside, or doing some other activity. After selecting his firearms, Johnson would then assist his female accomplice with Form 4473. Johnson also negotiated prices, handed over the cash himself, and personally carried each gun out of the store.

In *Corporan v. Wal-Mart Stores East, LP*, No. 16-2305-JWL, 2016 WL 3881341 (D. Kan. 2016) (unpublished opinion), Frazier Glenn Miller killed Reat Underwood with a shotgun acquired through a straw purchase. Miller went with John Mark Reidle to a Wal-Mart Supercenter, selected a shotgun, and told the salesperson that he did not have identification and that Reidle would complete the purchase. Reidle filled out Form 4473 and bought the shotgun.

In *Englund v. World Pawn Exchange, LLC*, No. 16CV00598, 2017 WL 7518923 (Or. Cir. 2017), Jeffrey Boyce had a felony conviction for unlawful use of a weapon and had mental health and drug abuse issues. Jeffrey ordered two firearms online in separate purchases and his mother, Diane Boyce, picked them up for him. For Jeffrey's third purchase, he emailed the supplier to ensure the gun was sent to the correct retailer, giving his name and specifying that he paid for the gun with his credit card number. The supplier recorded this transaction as "'sold to Jeffrey Boyce.'" 2017 WL 7518923, at *2.

In *Chiapperini v. Gander Mountain Co., Inc.*, 13 N.Y.S.3d 777, 48 Misc. 3d 865 (N.Y. Sup. Ct. 2014), Dawn Nguyen agreed to buy guns for William Spengler—a convicted manslaughter felon. Spengler went with her to buy the guns. Spengler told the salesperson they did not need assistance. Spengler provided the $1,425.58 in cash for the purchase. Spengler was present when Nguyen signed the necessary forms. And Spengler took the guns off the counter and left with them. Two and a half years later, Spengler killed his sister, set his house on fire, and shot four firefighters responding to the scene, killing two of them.

The evidence of a straw purchase is less obvious in the present case than in *Shirley*, *Carney*, *Corporan*, *Englund*, or *Chiapperini*. Even so, there exists sufficient evidence which the district court was required to view in the light most favorable to the Heirs. Here, we had a large man who was—even by Shirley's account—not only inside the store but nearby the purchaser, who was a small-statured senior citizen. This petite woman was seeking to purchase a specific type of handgun she likely would have had difficulty handling and paid with cash. Shirley responded initially to question 11.a of Form 4473 that she was not the actual purchaser, to which Roblyer encouraged a correction. An expert report revealed that this type of error occurred in less than 1% of P&S's sales. These combined circumstances surrounding the sale should have been— even in a P&S's employee's own testimony, not to mention the Heirs' expert testimony— enough to alert P&S to conduct further investigation.

Considering the red flags in the aggregate and viewing the aggregation in the light most favorable to the Heirs, we cannot say, as a matter of law, that P&S could not have actually or constructively known a straw purchase was occurring. Disputed material facts exist, and the district court did not consistently view the evidence in the Heirs' favor. Where "'reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.'" *Sall*, 281 Kan. at 1360.

III. *Did the Heirs establish causation?*

We next address the Heirs' causation argument. The Heirs claim that the district court erred in finding that there was insufficient evidence of causation to proceed with the lawsuit. Shirley argues that the Heirs misread the district court's ruling on causation. P&S argues that the district court did not err in its "but for" causation analysis.

As recited above, because the Heirs bring negligence claims, they must present evidence that P&S and Shirley owed them a duty; P&S and Shirley breached that duty;

21

the Heirs suffered an injury; and the breach proximately caused those injuries. *Sall*, 281 Kan. at 1360; *Najera*, 61 Kan. App. 2d at 375. Relevant to this particular argument, the district court found that the Heirs failed to sufficiently demonstrate the final point—that the breach caused their injuries. Generally, causation is a question of fact for a jury. *Najera*, 61 Kan. App. 2d at 375 (citing *Baker*, 240 Kan. at 557). But when the facts of causation "are susceptible to only one inference, the question is one of law and may be disposed of summarily by the court." *Baker*, 240 Kan. at 557.

Our court in *Najera* explained the components of proximate cause: causation in fact and legal causation.

"First, to establish causation in fact sufficient to submit a claim to a jury, '"a plaintiff must prove a cause-and-effect relationship between a defendant's conduct and the plaintiff's loss by presenting sufficient evidence from which a jury can conclude that *more likely than not*, but for defendant's conduct, the plaintiff's injuries would not have occurred."' (Emphasis added.) *Burnette* [*v. Eubanks*], 308 Kan. [838,] 846[, 425 P.3d 343 (2018)]. Second, to establish legal causation, the plaintiff must show '"it was foreseeable that the defendant's conduct might create a risk of harm to the victim and that the result of that conduct and contributing causes was foreseeable."' 308 Kan. at 846. Under Kansas law, the proximate cause requirement is identical to the concept of legal causation as described in the Restatement of Torts. See 308 Kan. at 848 (citing Restatement [Second] of Torts § 431 [1965]).

"A person's conduct is a *legal cause* of harm if '"(a) [the actor's] conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which [the actor's] negligence has resulted in the harm."' *Burnette*, 308 Kan. at 848 (quoting Restatement [Second] of Torts § 431 [1965]). Here, neither party argues that a rule of law exists relieving [Defendants] of liability. Therefore, if [Defendants'] actions in spraying pesticides in the Office Building is a 'substantial factor' in Plaintiffs' harm, judgment as a matter of law for Defendants was inappropriate. Even when two or more causes could cause the harm, a defendant's negligence can still be found the legal cause of the harm. In cases where '"two forces are actively operating, one because of the actor's negligence, the other not because of any

22

misconduct on [the actor's] part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about."' 308 Kan. at 848 (quoting Restatement [Second] of Torts § 432[2] [1965])." *Najera*, 61 Kan. App. 2d at 375-76.

To start our analysis, we note the parties' disagreement on how to frame the district court's ruling on causation. The district judge began its ruling by noting the evidence that David used the subject .45 caliber handgun to kill his father as follows:

"I agree with the plaintiff that they do have sufficient evidence to prove that it was that gun. I agree with both defendants that if it wasn't that gun, that that is a defense to this. But the plaintiff has sufficient evidence regarding that issue.

"What the plaintiff doesn't seem to have any evidence is the proximate cause argument, which is different than the foreseeability. And proximate cause was not eliminated by the Supreme Court.

. . . .

"But the thing is is whether or not Ms. Loder gave the gun or didn't give the gun wouldn't have changed what happened on that night when three guns were used. The defendant had far more guns available to him than even the ones that ended up at the scene. And whether or not that was—gun was given to him would not have changed the outcome. And therefore, I can't find that the plaintiff has any evidence to present to the jury on the but-for test that this negligent act caused the injury incurred, and it wouldn't [have] occurred but for the negligent act. So I'm granting the summary judgment motion to Defendant Loder as well."

The district court found, then, that the Heirs had sufficient evidence on the issue of foreseeability, but found causation-in-fact lacking.

The Heirs characterize this ruling as forcing them to disprove that David Madden could have used some firearm other than the specific .45 handgun to kill Thomas T. Shirley argues that the district court did not require the Heirs to produce positive evidence showing that David could not have used another gun. Instead, Shirley argues

23

that the district court simply noted a lack of evidence related to his use of the .45 handgun as necessary for the murder of Thomas T. P&S argues that the evidence does not show that David Madden would not have killed his father but for the .45 caliber handgun at issue because of the presence and use of other firearms. In the Heirs' reply, they note that the pathologist's report shows that Thomas T. was fighting with David when David shot him. They argue that David could only have used the .45 handgun at that point because the other three weapons present were long guns (a shotgun and rifles). They assert, without citation, that David could not have used a long gun in close proximity to his father. The Heirs also reiterate their claim that if law enforcement knew of Shirley's straw purchase, officers would have investigated and arrested Shirley and David, thus preventing Thomas T.'s murder.

The Heirs do not support their claim that David could not have used a different gun in close proximity to his father with a citation to evidence, as is their burden. And their claim that officers would have investigated and arrested Shirley and David if P&S had reported the purchase is an unsupported extension of their expert testimony. Former ATF official Bisbee testified that law enforcement would have taken seriously a gun seller's report "if they would have known the players involved." But Bisbee did not testify that the investigation would have led to an arrest. Bisbee's reference to "the players involved" echoes retired ATF Agent Vince's statement that ATF would have responded "[e]specially if they knew that it involved David Lee Madden." Vince likewise did not surmise that a law enforcement investigation would have led to David and Shirley's arrests. The Heirs assert that this was Vince's testimony, but their citation does not support it.

Still, the evidence of the firearms present at the crime scene is sufficient to establish a material question regarding causation under the facts presented in the record. The KBI documented two rifles and a shotgun on the scene. Kocher stated that he saw David carrying several firearms but specified that they were all handguns with only one

24

long gun. No handguns other than the .45 made their way into the house, as the KBI reports do not document any other handguns. A jury could conclude that the long gun that Kocher saw was the .30-06 rifle because Thomas testified that the .340 Weatherby belonged to his father, but he did not know where the .30-06 rifle came from. Record evidence supports the conclusion that David brought the .30-06 with him, but it was found empty on the scene.

Law enforcement reports surmised that David killed his father with the .45 caliber handgun that Shirley purchased from P&S and gave to David. He shot at police officers with his father's .340 Weatherby, which Thomas testified would have been in his father's house. But the .340 Weatherby rifle jammed. No evidence establishes whether David brought the shotgun or whether, like the .340 Weatherby, it was already in the house because it belonged to his father. The KBI report also does not mention any ammunition for a 12-gauge shotgun, either spent or live. When considered together and viewed in the light most favorable to the Heirs, the evidence presents a material question of fact whether David actually used the .45 to kill his father and whether it was the only usable firearm available to him at that moment. Therefore, the facts of causation are not susceptible to only one inference and should not have been disposed of summarily by the district court. See *Baker*, 240 Kan. at 557.

Compare our Kansas Supreme Court's decision in *Yount v. Deibert*, 282 Kan. 619, 147 P.3d 1065 (2006). There, Katherine Yount brought a wrongful death action for her son Henry J. Yount Jr. against three of Henry's friends. The defendants were at Yount's house engaging in various pyromaniacal activities. They lit numerous candles in the living room, burned matches and small fires, tried to light some alcohol or perfume near a coffee table, went outside and lit fireworks, burned lighter fluid and part of a tree, and experimented with pop bottle bombs. An investigator from the fire marshal's office testified that he could not determine the exact cause of the house fire that killed Henry. The district court granted summary judgment, conceding that "'a jury could well find that

25

the group activities of the defendants were the likely cause of this fire,'" but that Yount could not show which particular activity caused the fire or which defendant engaged in that particular activity. 282 Kan. at 621.

Our Supreme Court reversed the grant of summary judgment and remanded the case for trial, explaining a plaintiff's burden of proof on causation at summary judgment.

> "'The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was *a cause* in fact of the result. . . .
>
> ". . . The plaintiff need not [negate] entirely the possibility that the defendant's conduct was not a cause.'" (Emphasis added.) 282 Kan. at 628.

The *Yount* court held that Yount did not need to prove which particular candle or flame started the fire. 282 Kan. at 629.

P&S argues that the Heirs conveniently ignore the language in *Yount* requiring "'[a] mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.'" 282 Kan. at 628. Here, though, given the evidence in the record that suggested that Thomas T. was killed by the subject firearm, there is more than a mere possibility of causation.

Another case cited by the Heirs helps to illustrate this point. Survivors of a shooting and relatives of those injured or killed brought multiple claims in *Holcombe v. United States*, No. SA-18-CV-555-XR, 2021 WL 67217 (W.D. Tex. 2021) (unpublished opinion). Devin Patrick Kelley entered a church in Texas and opened fire, killing 26 people and wounding 22 more. After fleeing the scene, Kelley shot and killed himself. The plaintiffs sued the Government, alleging several failures to prevent the shooting. Kelley had been convicted by court martial for an assault on his wife and stepson during

26

his time in the Air Force. But the Air Force failed to report all military offenders to the Federal Bureau of Investigation's Criminal Justice Information Services Division. 2021 WL 67217, at *1. The *Holcombe* court concluded that the Government assumed a duty to establish and operate a complex national background-check system. The plaintiffs alleged essentially that the Government failed—at multiple points—to operate the background-check system in a way that would have prevented Kelley from obtaining a firearm. Sufficient evidence established genuine issues of fact, and the *Holcombe* court denied the Government's motion for summary judgment. 2021 WL 67217, at *29.

The Heirs note a failed argument that the Government put forth in *Holcombe*. The Government argued that the plaintiffs failed to show causation because Kelley could have borrowed a firearm or purchased one from a non-FFL such as at a gun show. 2021 WL 67217, at *15. But the plaintiffs argued that the existence of other avenues for acquiring firearms was insufficient to show that Kelley would have used guns acquired this way. They argued that even if Kelley knew how to buy firearms from other sources, there was no evidence that he would have bought from a non-FFL if he could not get guns from an FFL. They noted that Kelley in fact bought two guns from a friend, but the guns were "'so unreliable that he threw one away and traded the other for a dog on Craigslist.'" 2021 WL 67217, at *15. The *Holcombe* court was unpersuaded by the Government's potential-other-firearm argument, holding that the parties' disagreement over the likelihood that Kelley would have used a different firearm represented a genuine issue of material fact precluding summary judgment. 2021 WL 67217, at *16.

A nearly 125-year-old case, which remains good law in Kansas, further supports the Heirs' claims. A defendant railroad company hypothesized other causes of a brush fire in *Railroad Co. v. Perry*, 65 Kan. 792, 70 P. 876 (1902). There was no evidence that passing trains had emitted sparks or any direct evidence that the fires originated from the trains, and defendant argued it was equally likely that something was thrown from a passenger window or workman that could have caused the fire. Our Supreme Court

27

rejected the idea that the plaintiffs needed to disprove any hypothetical that the defendants might put forward, saying that if the plaintiffs "present a reasonably adequate cause, they will be sufficient to go to the jury, even though some other cause which may be suggested may not be excluded." 65 Kan. at 794. In short, a defendant fails to properly support a summary judgment motion by merely hypothesizing some other possible cause of harm.

Here, of course, the hypothesized harm is less speculative than what the court faced in *Perry*, given that David was seen with other firearms and other firearms were documented at the crime scene. Still, the credible evidence viewed in favor of the Heirs and as testified to by law enforcement suggests David killed his father with the .45 that Shirley procured from P&S.

In *Donley v. Amerada Petroleum Corp.*, 152 Kan. 518, 106 P.2d 652 (1940), the Donleys operated their farm downstream from defendants Amerada Petroleum Corporation and Shell Petroleum Corporation. Saltwater runoff made the Donleys' cattle sickly and forced the Donleys to herd their cattle to prevent them from drinking the salt water. An investigation of Shell and Amerada discovered their lease properties were the source of saltwater contamination, with no evidence of another source. Our Supreme Court held that the Donleys "were not obliged to exclude every other *possible* source of pollution after establishing facts from which it reasonably could be inferred that appellants had polluted the stream." (Emphasis added.) 152 Kan. at 523. In short, a hypothesized other polluter could be a possibility, but the plaintiffs have no obligation to disprove such a contention to survive summary judgment.

Our court addressed the issue of causation in *Najera*. In *Najera*, the plaintiffs sued a pest control company after being exposed to pesticides sprayed in their workplace. The district court granted summary judgment on causation grounds. We reversed, holding that the plaintiffs established a genuine issue of material fact based on testimony regarding

28

potential effects of exposure, the safety data on the relevant chemicals, and medical diagnoses of conditions which were consistent with the known side effects of the chemicals at issue. The defendants cited flaws in the plaintiffs' claims, including "abundant evidence" that the plaintiffs' injuries resulted from other causes. 61 Kan. App. 2d at 384. In *Najera* defendants did not simply hypothesize an alternate cause. See *Perry*, 65 Kan. at 793-94. Some evidence showed that one plaintiff's medical history included possible neuropathy which predated the pesticide incident. But the *Najera* court reiterated the rule that plaintiffs do not need to disprove other potential causes in addition to presenting credible evidence of the cause they allege.

As our court explained in *Najera*, "Submission of this case to the jury does not mean Plaintiffs have proven their claims but that they have provided enough evidence to present a question of fact for the jury." 61 Kan. App. 2d at 384. We find similarly here. Given the evidence in the record of David's use of the subject .45 handgun, and the potential that other guns were either unusable or unavailable, we do not conclude that "the facts of causation 'are susceptible to only one inference,'" and as a result, the Heirs are entitled to present their case to a jury. 61 Kan. App. 2d at 375.

IV. *The Protection of Lawful Commerce in Arms Act claim is unpreserved for appeal.*

Finally, we must also address P&S's argument that even if we reverse the district court's decision on knowledge or causation, we should uphold its decision on other grounds. P&S alternatively claims that this action should be considered a "'Qualified Civil Liability Action'" as defined by the PLCAA, 15 U.S.C. § 7901 et seq., and is accordingly subject to dismissal. One of the purposes of the PLCAA is to "prohibit causes of action against . . . dealers . . . for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended." 15 U.S.C. § 7901(b)(1).

In its initial response to the Heirs' petition, P&S argued the claims should be dismissed by application of the PLCAA, which led to the Heirs claiming the PLCAA is unconstitutional. During a hearing on the issue, the district court found the PLCAA constitutional and found the Heirs' claims "subject to [the] PLCAA" and that the claims "qualify under exceptions in [the PLCAA] and are not subject to dismissal." Although its written order does not indicate as much, the transcript of the motion to dismiss hearing shows that the district court stated, "The matter may proceed on those exceptions of PLCAA, . . . *at least to discovery*"—suggesting perhaps the matter remained unsettled. (Emphasis added.)

Along these lines, P&S now argues that a cross-appeal of the district court's decision was not necessary because the issue was "'unaddressed, not rejected'" by the district court and is, as a result, properly before us on appeal, quoting *Lumry*, 305 Kan. at 554. In *Lumry*, the Kansas Supreme Court acknowledged that it had "previously considered arguments not addressed by the district court as alternative bases to affirm despite no cross-appeal having been perfected." 305 Kan. at 554. But it also found that *Lumry* was "not one of those instances" because the district court specifically addressed the identified claim and "defendants failed to cross-appeal as required by" K.S.A. 60-2103(h). 305 Kan. 553-54.

Likewise, we find P&S's characterization that the district court here did not address the PLCAA claim simply incorrect. In addition to its earlier ruling on P&S's motion to dismiss, the district judge again addressed the PLCAA issue during its summary judgment ruling, clearly stating:

> "We did address the constitutionality of the PLCAA and also its application to this matter. I found it to be a constitutional statute, and I do find it to be a limitation of liability, if it's applicable.

"I do believe it is applicable to this case. But I also believe that the causes of action that remained after we had that hearing are an exception. And it's not a question of the entire statute is no longer applicable. If the plaintiffs come up with one exception, their exception is still applicable."

Later in the same ruling, the district court reiterated that the "federal law [PLCAA] does not control the Kansas law. It was only a statute of immunity, which the plaintiffs have gotten past only for the exception." It appears, then, that the district court considered P&S's assertion of a defense under the PLCAA on its merits.

There is a distinction between an argument previously rejected by the district court and an alternate, unaddressed rationale for a district court's judgment. The former may not be briefed by an appellee as grounds to support a district court's decision for an alternative reason without a timely filed cross-appeal. See K.S.A. 60-2103(h); *Butler v. Shawnee Mission School District Board of Education*, 314 Kan. 553, 571, 502 P.3d 89 (2022). Here, P&S asserted to the district court that the Heirs were barred from bringing their claim by the PLCAA and that no exception to the PLCAA allowed their claim to proceed. The district court explicitly addressed the issue at the motion to dismiss hearing and then reiterated its earlier findings in its ruling on summary judgment motions, rejecting P&S's argument. Without a cross-appeal of the district court's ruling on the applicability of the PLCAA, the issue is not properly before us.

V. *Conclusion*

As explained above, "summary judgments are to be granted with caution in negligence actions." *Fettke v. City of Wichita*, 264 Kan. 629, 632, 957 P.2d 409 (1998). On thorough review, we determine that, given the evidence presented, reasonable minds could differ on the merits of the Heirs' claims which precludes judgment as a matter of

law. We reverse the district court's judgment and remand this case to the district court for further proceedings.

We recognize that this matter has been proceeding through the court system for an extended amount of time since its inception in the district court and a trial will only lengthen this delay. This is a combination of many forces, including both the laggard but necessary processes that make up our civil justice system and the prolonged issuance of this opinion. We strive to efficiently resolve appeals, yet we sometimes fail despite our best efforts.

Reversed and remanded.